**Byron M. KALMAKOFF, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–9700, 3NA–03–086 Cr.**

Court of Appeals of Alaska.

Jan. 16, 2009.

**14.** *See, e.g., Eide v. State,* 168 P.3d 499, 500 (Alaska App.2007); *Simpson v. State,* 877 P.2d 1319, 1320 (Alaska App.1994).

Margi A. Mock (opening brief) and Josie Garton (reply brief), Assistant Public Defenders, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, MANNHEIMER, Judge, and STEWART, Senior Court of Appeals Judge.[*]

*OPINION*

MANNHEIMER, Judge.

Byron M. Kalmakoff was convicted of raping and murdering a young woman in Pilot Point. At his trial, the State relied on statements that Kalmakoff made to the state troopers who came to Pilot Point to investigate the homicide. In this appeal, Kalmakoff argues that the statements introduced at his trial were the tainted fruit of violations of Kalmakoff's *Miranda* rights.[2] For the reasons explained here, we conclude that even though the troopers may have violated Kalmakoff's *Miranda* rights, the major portion of the challenged evidence was not tainted by these *Miranda* violations and was properly admitted at trial. We therefore affirm Kalmakoff's convictions.

*Underlying facts—Kalmakoff's first interview with the troopers*

On the afternoon of February 10, 2002, the naked body of a young woman, B.K., was found near the airport in Pilot Point, a small village on the Alaska Peninsula. B.K. had two gunshot wounds to her head. A later autopsy indicated that someone had engaged

---

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

**2.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

in vaginal and anal intercourse with B.K. near the time of her death.

Following B.K.'s disappearance, the village public safety officer, VPSO Molly Etuckmelra, summoned the state troopers. Troopers John Shane Stephenson and Peter Mlynarik were dispatched to Pilot Point to investigate. By the time they arrived, B.K.'s body had been discovered.

B.K. had last been seen alive the evening before, at a party at the house of Rick Reynolds. At the request of the troopers, VPSO Etuckmelra and the city manager contacted everyone who attended this party and asked them to come to the city office building to be interviewed. One of these people was fifteen-year-old Byron Kalmakoff.

The troopers conducted all of their interviews in the meeting room of the city office building—a large room (approximately 20 by 32 feet) that was well-lit, with several windows and two or three doors. Several collapsible tables were set up in this meeting room, and the two troopers conducted their interviews at one of these tables.

Late in the morning of February 12, 2002, acting at the direction of Trooper Stephenson, VPSO Etuckmelra drove to the Pilot Point school and, after alerting the principal, she picked up three teenage boys—Leon Neketa, Aaron Kalmakoff, and Byron Kalmakoff—and transported them to the city office building in her patrol vehicle.

Etuckmelra testified that, before she transported Byron Kalmakoff from the school, she telephoned Byron's grandmother (and adoptive mother), Martha Kalmakoff. According to Etuckmelra, she told Martha Kalmakoff that the troopers wanted to talk to Byron, and Martha said that this was okay.

But at the evidentiary hearing in the superior court, Martha Kalmakoff testified to a different version of events. According to Martha, VPSO Etuckmelra never contacted her, and she had no idea that Byron was being interviewed by the state troopers until the mid-afternoon (after the interview was underway), when she received a telephone call from her daughter, Jackie Kalmakoff, who worked in the Pilot Point community center (the building next to the city office building). Martha's version of events was corroborated by the testimony of her daughter Jackie.

The superior court never resolved this conflict in the testimony.

The troopers' interview with Kalmakoff began at 1:35 p.m. on February 12th, and it lasted approximately one and a half hours. During this first interview, the troopers asked Kalmakoff to describe his whereabouts and activities on the night of the homicide.

Kalmakoff told the troopers that he attended a dance early in the evening, and that he drank a little whiskey there. Later, Kalmakoff and his friend Aaron Kalmakoff (the brother of the victim) went to the party at Rick Reynolds's house. Kalmakoff admitted that he drank some more liquor at the party.

Kalmakoff told the troopers that he and Aaron left the party around 2:00 a.m. and went to Aaron's house. Then, somewhere between 3:00 and 4:00 a.m., they left the house to check on Aaron's sister, B.K. The two boys first went to the home of Kalmakoff's aunt, Jackie Kalmakoff, but B.K. was not there. Jackie told them that B.K. had gone back to Rick Reynolds's house, so the boys went there.

When the boys entered Reynolds's house, the party had wound down and the house was quiet. They went upstairs and found B.K. lying on a couch, unconscious. Kalmakoff tried to wake her up, but initially she could not be roused. Then, when B.K. finally woke up, she needed to use the bathroom, so Kalmakoff went downstairs. Kalmakoff told the troopers that, a little later, B.K. got mad at the two boys and told them to leave the house—so they left.

At this point, however, the interview moved in a new direction. Kalmakoff admitted that, while he was downstairs in Reynolds's house, he went "snooping" and found a pistol. He picked up the pistol and took it outside. Kalmakoff also told the troopers that he picked up a box of ammunition for the pistol—although he repeatedly and consistently claimed that this ammunition consisted of blanks rather than bullets.

Kalmakoff declared that he and Aaron took the pistol back to Aaron's house, where they proceeded to fire it several times (using blanks). Then they returned the pistol to Reynolds's house and put it back where they had found it. Kalmakoff claimed that he later threw away the extra ammunition and the expended blanks (*i.e.,* the casings) in the trash.

In response to the troopers' follow-up questions, Kalmakoff denied that either he or Aaron had fired the pistol at Reynolds's house. Kalmakoff also denied that he ever used the pistol to scare B.K. And when Trooper Stephenson openly suggested that Kalmakoff had killed B.K., Kalmakoff immediately responded that he did not kill her, and that he did not know who did.

Shortly after this conversation, Kalmakoff left the room (apparently, to use the bathroom or get a drink). During this interlude, despite Kalmakoff's protestations of innocence, Stephenson told Mlynarik, "I think we're hot on the trail now."

The troopers turned the tape recorder back on at 2:20 p.m. At this point, the interview had been going on for 45 minutes (that is, since 1:35 p.m.). When Kalmakoff asked the troopers, "How much more time [are] we gonna be here?", Stephenson replied, "a little bit [more]".

The troopers asked Kalmakoff more questions about the pistol. Kalmakoff told them that he and Aaron each fired the pistol a half dozen times. When they got done firing the pistol, Aaron was the one who returned the pistol to Reynolds's house, and Kalmakoff was the one who threw the spent casings into the trash.

A few minutes later, the troopers asked to examine Kalmakoff's upper body (without his shirt), and they also asked Kalmakoff to show them the bottoms of his shoes. The troopers were interested in examining Kalmakoff's shoes (indeed, the shoes of everyone they interviewed) because they had found a distinctive shoe print at the crime scene. When Kalmakoff showed the troopers the bottom of his shoe, the troopers could see that the pattern on the sole of the shoe closely resembled the shoe print found at the

crime scene. (Later, when they were walking around the village with Kalmakoff, the troopers confirmed that the tracks left in the snow by Kalmakoff's shoes were a close match to the shoe print found at the crime scene.)

Just after Kalmakoff displayed his upper body and the bottoms of his shoes to the troopers, the troopers asked Kalmakoff to lead them through the village to view the places that Kalmakoff had been describing during the interview.

At the conclusion of this tour, Kalmakoff asked the troopers, "Do I have to go back [to the city office building] again?" Stephenson replied, "Yeah, we're not even done...."

A little later, after they returned to the city office building, Stephenson seized Kalmakoff's four-wheeler, his shoes, and his coat and gloves as evidence. Stephenson also told Kalmakoff and his grandmother, Martha Kalmakoff, that he did not want Kalmakoff to go back to Martha's house or to his mother's house (*i.e.,* Ruby Moore's house) until the troopers give him permission—which, according to Stephenson, would be sometime that evening.

(The troopers wanted to keep Kalmakoff out of those places until they could get search warrants to examine the clothing and other physical evidence at these two homes.)

The first interview ended at this point. According to Martha Kalmakoff's later testimony at the evidentiary hearing, she and her daughter Jackie took Kalmakoff to the community hall—because the troopers had said that they did not want him returning to either Martha's home or his mother's home. They waited in the community hall until late in the evening. Finally, a trooper came by and spoke to Jackie; he told her that it was now okay for them to go home.

*Underlying facts—Kalmakoff's second interview with the troopers*

The following day (February 13, 2002), the troopers again asked Kalmakoff to leave school and talk to them at the city office building. This second interview began at 11:30 a.m. and lasted forty minutes.

This time, the interview was conducted by Trooper Stephenson and Trooper Craig Allen. At the beginning of the interview, Trooper Allen assured Kalmakoff that he was free to leave any time he wished. However, when Kalmakoff immediately announced that he did not want to talk to the troopers, the troopers refused to let him go, and they continued to interrogate him:

*Allen:* You don't have to sit here and talk with us, okay? You can ... go back to school whenever you want. You understand that?

*Kalmakoff:* Yeah.

*Allen:* The reason we [are] tell[ing] you that is so that you know that ... when you're finished talking to us, you just let us know and get up and ... go; we'll get you back to school. Okay?

*Kalmakoff:* I[can] go back right now if I want to?

*Allen:* Yeah, [you] sure can. Okay? Is that what you want to do? Or do you want to talk with us a little bit, so I can understand what's going on?

*Kalmakoff:* I feel like going back [to school].

*Allen:* Yeah. Okay. Is—is there any reason you don't want to talk to [us] about stuff ... that I'm going to ask you about?

*Kalmakoff:* I can't barely remember anything.

*Allen:* Can't barely remember anything?

*Kalmakoff:* Sometimes I black out.

*Allen:* Maybe if we talk a little bit, maybe I could help you remember some stuff.

*Kalmakoff:* I don't know. [I'm] sort of scared.

*Allen:* Yeah? What are you scared about, Byron?

*Kalmakoff:* That I did it.

*Allen:* You don't just wake up [one] day ... and wonder[,] "Did you do it?" ... You might have some things ... that you can really remember, [or things] that you saw the next day to make you think ... that. Right? And you probably have some of those ideas. You want to share those with me? ... And maybe ... we'll understand why this happened, okay? ...

Wouldn't you like to be able to go to bed tonight knowing why something like this happened, rather than [it] just being something ... that you'll never have an answer to?

*Kalmakoff:* Yes.

...

*Allen:* Where do you want to start? You want to start with what happened to [B.K.]?

*Kalmakoff:* [I] can't really remember.

*Allen:* [You] can't really remember, but ... you've thought about it since then, haven't you? I mean, you might not remember every little detail, but you ... can talk with me about what happened, [about] what you can remember, can't you?

*Kalmakoff:* Can I just go back to school?

*Allen:* You can go back to school any time you want. We've told you that.... That's entirely up to you.

*Kalmakoff:* I just want to go back now.

*Allen:* Okay.

*Kalmakoff:* I'm gonna go home and talk to my grandma. (Pause) Can I go back now?

*Allen:* Beg pardon?

*Kalmakoff:* Can we go back there?

*Allen:* You can go back there any time you want. It's up to you.

*Kalmakoff:* All right.

*Stephenson:* Um, actually, ... Byron, um, I'm going to have to ask you to stay here ... and talk with me, okay? There's some things that I just absolutely have to know.

At this point, Trooper Stephenson advised Kalmakoff of his *Miranda* rights. Following this advisement, Stephenson asked Kalmakoff if he wanted to waive his rights and talk to the troopers. Kalmakoff shook his head "no".

Immediately following Kalmakoff's nonverbal statement that he did not wish to talk to the troopers, Trooper Allen re-entered the conversation and told Kalmakoff that, because he was 15 years old, he had the choice of whether to have a parent or guardian sit

in on the interview. When Kalmakoff replied, "Do I have to stay here?", Allen told him, "Yeah, we're going to have you stay here for a little while, Byron." Stephenson then added, "So you can either talk to us [alone], or you can have your mom or your grandma come down and be with you."

The troopers then suggested that Kalmakoff could listen to them describe what they had learned from their investigation so far, and that perhaps (after hearing this) Kalmakoff would want to make some comments.

In response to this tactic, Kalmakoff made one self-incriminating admission: he admitted to drinking about half a pint of whiskey on the evening of the homicide. But almost immediately afterward, he again told the troopers, "I don't really feel like answering questions."

At this point, the troopers finally honored Kalmakoff's invocation of his right to silence; they stopped interrogating him. However, the troopers told Kalmakoff that they had "some other stuff that [they] need[ed] to do". They then proceeded to serve a search warrant that authorized them to photograph Kalmakoff without his clothes on, to take hair samples from his head, arm, leg, and pubic area, and to take swabs from his penis and the inside of his mouth.

After taking these photographs and body samples, the troopers told Kalmakoff that they remained very interested in understanding what had happened to B.K. They suggested that "sometimes, bad things happen ... because things just get out of control", and they encouraged Kalmakoff to contact them later if "[at] any time [he] change[d][his] mind and want[ed] to get it off [his] chest". The troopers then allowed Kalmakoff to return to school.

This second interview ended at 12:10 p.m.

*Underlying facts—Kalmakoff's third interview with the troopers*

About three and a half hours later (at 3:35 p.m. on the afternoon of February 13, 2002), Troopers Stephenson and Allen visited Kalmakoff's home—the residence of his grandparents (and adoptive parents), Micarlo and Martha Kalmakoff. School was over for the day, so both Kalmakoff and his two grandparents were home.

The troopers told Kalmakoff and his grandparents that they wanted to interview Kalmakoff one more time:

*Stephenson:* [We] just thought we'd all get together and ... talk [for] a few minutes, and see if we can't get this thing taken care of, and get on with life. So we wanted to stop in and ... [we] thought your grandma and grandpa could be in on this, okay?

. . .

*Allen:* Because, you know, ... there's some things that you might've told us already that [your grandparents] might not even know about. You think that would be fair, you think? And we're not doing this to embarrass you, or anything like that, with your grandparents. Eventually, all the information is going to be available, okay?

*Kalmakoff:* You want me to (indiscernible).

*Allen:* So, would you like to start off, so that you can bring your grandparents up to speed on everything that you've talked to us about already?

*Stephenson:* Byron, I just want to remind you that what I read to you earlier still applies. But ... like I said, we're hoping we can just get everything out in the open, [so] we can get on an airplane, head back to town.

*Allen:* It's your choice, but—you know, if you want to talk to us about this in front of your grandparents or not, that's entirely your choice.

*Kalmakoff:* Yeah. I don't know where to start from, though.

*Allen:* Well, let me—you know, ... you could—Did you talk with Trooper Stephenson about ... a gun?

*Kalmakoff:* Yeah.

*Allen:* [Do] your grandparents know about that?

*Kalmakoff:* (Indiscernible) about (indiscernible).

*Micarlo Kalmakoff:* Yeah, he's told me a little bit about that yesterday.

*Allen:* Okay.

*Stephenson:* Okay, why don't we start there. That's ... a good point [to start]. Um, you told me yesterday that you and Aaron went down [to Rick Reynolds's house] to check on [B.K.], and you ... were snooping a little bit [and] found a pistol. Is that correct?

*Kalmakoff:* Yeah.

*Stephenson:* Okay. Why don't we just go from there: what you guys did while you were in the basement snooping around, and then we'll just go from there. You tell me in your own words what you told me yesterday, and we'll fill in the blanks....

The troopers proceeded with the interview, and Kalmakoff made statements that were more and more self-incriminatory. He never expressed a desire to stop, or even a reluctance to continue answering questions.

By the time this third interview ended, Kalmakoff admitted that he and B.K. got into an argument at Reynolds's house—she was criticizing him for being drunk—and that, during this argument, Kalmakoff accidentally shot her. Kalmakoff also admitted that he carried B.K.'s body outside and placed it in some bushes.

The interview ended a few minutes later, at 4:00 p.m. All told, this third interview lasted less than 25 minutes. Despite Kalmakoff's admission that he killed B.K., the troopers did not take him into custody; they left him at home.

### Underlying facts—Kalmakoff's fourth interview with the troopers

The following afternoon (at 12:55 p.m. on February 14, 2002), the troopers went to the Pilot Point school to take Kalmakoff into custody and fly him to the McLaughlin Youth Center in Anchorage.

When the troopers picked up Kalmakoff from school, they asked him if he would ride around with them and "talk with [them] about what happened". Kalmakoff agreed, and he left the school with the troopers. The troopers then informed Kalmakoff that he would have to go to Anchorage with them, and that he would have to stay in Anchorage for at least a few days.

Kalmakoff asked the troopers if they had told anyone else in the village about the things that Kalmakoff had told them the day before. Kalmakoff also repeatedly declared that he "didn't do it on purpose"—and he insisted that, if the troopers did tell other people in the village about what Kalmakoff had done, they clarify that "[he] didn't do it on purpose". Kalmakoff also told the troopers, "It's that dang booze."

At this point, Trooper Allen advised Kalmakoff of his *Miranda* rights, as well as his right to have a parent or guardian present. Kalmakoff waived his rights.

The troopers then commenced the fourth interview with Kalmakoff. This interview lasted approximately 45–50 minutes. During this interview, Kalmakoff described shooting B.K., transporting her body on his four-wheeler, and then disrobing B.K. and having sex with her. The main portion of this interview ended at 1:50 p.m.

### The superior court's ruling

Following Kalmakoff's indictment, he asked the superior court to suppress all four statements that he gave to the state troopers.

With respect to the first interview at the city office building, Kalmakoff argued that he was in custody for *Miranda* purposes, and that the troopers failed to advise him of his *Miranda* rights.

With respect to the second interview at the city office building, Kalmakoff argued that he was again in custody for *Miranda* purposes, that the troopers at first failed to advise him of his rights, and that the troopers later advised him of his rights but then failed to honor his invocation of his right to silence.

With respect to the interview at his (and his grandparents') home, Kalmakoff argued that this interview was, in essence, an extension of the second interview, and that even though the troopers reminded him of his *Miranda* rights, his statements at this third interview were tainted by the previous *Miranda* violations—in particular, by the troopers' flagrant failure to honor his invocation of

his right to remain silent at the second interview.

Finally, with respect to the fourth interview (the one that took place on the day of Kalmakoff's arrest), Kalmakoff conceded that he was advised of his *Miranda* rights and that he told the troopers that he wished to waive those rights, but Kalmakoff argued that his waiver and his ensuing statements to the troopers were tainted by the earlier *Miranda* violations. Based on the troopers' earlier failure to honor his rights, Kalmakoff contended that he did not truly understand that he could not be compelled to answer the troopers' questions. Kalmakoff further contended that, when the troopers discussed his juvenile status, they effectively misled him concerning the consequences of any self-incriminatory statements.

Superior Court Judge Fred J. Torrisi granted Kalmakoff's suppression motion in part.

The judge ruled that Kalmakoff was not in custody when the first interview began. However, the judge concluded that the situation altered significantly when the troopers took a break, Kalmakoff left the interview room, and Trooper Stephenson remarked to his partner that they were "hot on the trail". At that point, Judge Torrisi concluded, the interview became custodial—and therefore, because Kalmakoff did not receive *Miranda* warnings, his post-break statements had to be suppressed.

Judge Torrisi also concluded that Kalmakoff was in custody throughout the second interview. Accordingly, the judge suppressed all of the statements that Kalmakoff made before the troopers administered the *Miranda* warnings. The judge also suppressed all of the statements that Kalmakoff made *after* he received the *Miranda* warnings—because the troopers failed to honor Kalmakoff's assertion of his right to silence.

However, Judge Torrisi concluded that these *Miranda* violations did not taint the third and fourth interviews—*i.e.*, the interview at Kalmakoff's house on the afternoon of February 13, 2002 and the interview that took place the next day when the troopers went to the village school to take Kalmakoff into custody.

Judge Torrisi noted that, even though the second interview at the city office building was custodial in its entirety, Kalmakoff was released at the conclusion of that interview. The third interview began three and a half hours later, and Kalmakoff remained out of custody during that entire interval. And, on the issue of whether the troopers' violation of *Miranda* at the second interview tainted the third interview, Judge Torrisi declared that the troopers' violation of *Miranda* at the second interview was not "flagrant".

Judge Torrisi further concluded that the third interview was non-custodial. The judge noted (1) that the interview took place in the home shared by Kalmakoff and his grandparents, (2) that Kalmakoff was at liberty for several hours before the interview, thus giving him the opportunity to consult his grandparents, and (3) that the interview occurred in the presence of his grandparents.

In addition, Judge Torrisi noted that even though the troopers did not formally repeat the *Miranda* warnings at this third interview, "they did at least remind [Kalmakoff] of his rights". For these reasons—*i.e.*, the fact that the interview was non-custodial, and the fact that Kalmakoff was reminded of his rights—Judge Torrisi concluded that the third interview was not tainted by the earlier *Miranda* violations.

With respect to the fourth interview, Judge Torrisi concluded that Kalmakoff's statements to the troopers were fully admissible. The judge noted that the troopers formally advised Kalmakoff of his rights at the beginning of this interview, and that Kalmakoff (for the first time) explicitly waived those rights and consented to talk to the troopers about the homicide.

Regarding Kalmakoff's argument that he did not fully understand his rights, Judge Torrisi noted that it was "not uncommon for a suspect to ask for clarification of his rights", and the judge noted that the troopers' statements and responses to Kalmakoff were "[not] overbearing or coercive".

*The issues raised on appeal*

As just explained, Judge Torrisi suppressed the latter portion of the first interview (the interview that took place at the city office building on February 12, 2002) and the entirety of the second interview (the interview that took place at the city office building the following day, February 13, 2002) on the grounds that the troopers violated Kalmakoff's *Miranda* rights—by failing to administer *Miranda* warnings at the first interview, and by failing to honor Kalmakoff's invocation of the right to silence at the second interview. In this appeal, Kalmakoff argues that Judge Torrisi's ruling did not go far enough.

Kalmakoff contends that he was in custody (for *Miranda* purposes) throughout the first interview, and that, as a consequence, the entirety of that first interview should have been suppressed. Kalmakoff further contends that the troopers used his statements during that first interview as investigative ammunition during the third and fourth interviews, and that the statements he gave during those latter two interviews are therefore the tainted fruit of the first interview.

Alternatively, Kalmakoff argues that even if Judge Torrisi was correct about the first interview—that is, even if Kalmakoff was not in custody during the initial portion of that first interview, so that the statements he made during that first portion were properly admissible against him—the third and fourth interviews were nevertheless tainted by the *Miranda* violations that occurred during the second half of the first interview and at the second interview.

Kalmakoff argues that even though the third interview took place at his home, he was in custody for *Miranda* purposes during that interview, owing to the coercive effects of the earlier *Miranda* violations at his first and second interviews.

Kalmakoff further argues that even though he received full *Miranda* warnings, and explicitly waived his rights before the fourth interview (the one that took place when the troopers came to the Pilot Point school on February 14, 2002 to arrest him and take him to Anchorage), that fourth interview was tainted by the *Miranda* violations at the first, second, and third interviews.

*Was Kalmakoff in custody for Miranda purposes from the beginning of the first interview?*

As explained above, when the troopers arrived in Pilot Point to investigate the homicide, they asked local officials to contact everyone who had attended the party at Rick Reynolds's house, and to have these people come to the city office building to be interviewed. Acting on the troopers' request, VPSO Etuckmelra went to the Pilot Point school to get three boys: Leon Neketa, Aaron Kalmakoff, and Byron Kalmakoff. Etuckmelra notified the school principal that the boys would be leaving class, and (as later found by Judge Torrisi) she told Kalmakoff "that the troopers needed some information from him." Etuckmelra then transported the three boys to the city office building in her patrol vehicle.

As we also explained, there is an unresolved conflict in the testimony as to whether Etuckmelra notified Byron Kalmakoff's grandmother and guardian, Martha Kalmakoff, about what was happening. According to Etuckmelra's testimony, she telephoned Martha Kalmakoff and told her that she was taking Byron to the city office building to be interviewed—to which Martha responded that this was fine. But according to the testimony of Martha Kalmakoff and her daughter, Jackie Kalmakoff (Byron Kalmakoff's aunt), Etuckmelra did not notify Martha about the interview—and Martha did not find out that Byron was being interviewed by the troopers until the interview was underway, when Jackie called her.

In his written decision, Judge Torrisi noted this conflict in the testimony but he did not resolve it.

In his briefs to this Court, Kalmakoff argues that this first interview was custodial from its inception. Kalmakoff notes that students are not free to leave school on their own. From this, he concludes that a reasonable person in his position would have believed that he was not free to refuse Etuckmelra's request to accompany her to the city office building, nor free to leave the city

office building until Etuckmelra or the troopers told him that he was free to go.

For its part, the State notes that Judge Torrisi found that Kalmakoff "didn't express any reluctance" to accompany Etuckmelra, and that Etuckmelra's act of transporting the boys in her truck could easily be explained in terms of efficiency and comfort, rather than a desire to isolate or intimidate the boys. The State also notes that, after Kalmakoff arrived at the city office building, he apparently waited for some time in the outer hallway, with other Pilot Point residents, while the troopers were interviewing other people. And the State notes that, during a bathroom break, Kalmakoff went through the outer lobby, saw his grandmother sitting there, and merely smiled at her and continued walking—in other words, Kalmakoff had access to his grandmother, but did not attempt to talk to her about his situation, or to seek her help or advice.

Although both Kalmakoff and the State have done an admirable job of assembling and arguing the facts of the case in light of their respective positions, neither Kalmakoff nor the State has provided this Court with case law addressing the primary underlying legal issue: whether, and how, an adolescent's status as a secondary school student affects the assessment of whether a police interview is "custodial" for purposes of *Miranda* when the adolescent is summoned from class to be interviewed.

■ There are, in fact, many appellate court decisions dealing with this issue. Although these decisions reach differing conclusions regarding whether a particular juvenile was in *Miranda* custody, depending on the facts of each case, they are virtually unanimous in recognizing that a directive or "request" for a secondary school student to leave class for the purpose of being questioned by a police officer can result in a custodial interrogation for *Miranda* purposes. The factors that courts consider are: (1) the age and sophistication of the student, (2) whether the student was told that they were free to leave or to break off the questioning if they wished, and (3) whether the student was given the opportunity to consult

or obtain the presence of a parent or guardian.

Two of the major cases in this area were decided by the Oregon Court of Appeals: *State ex rel. Juvenile Department of Lane County v. Killitz*, 59 Or.App. 720, 651 P.2d 1382 (1982), and *State ex rel. Juvenile Department of Multnomah County v. Loredo*, 125 Or.App. 390, 865 P.2d 1312 (1993).

In *Killitz*, a junior high student was summoned to the principal's office, where he was interviewed by a uniformed, armed police officer in the principal's presence. The court concluded that the student was in custody during this interview because (1) the student would have been subject to disciplinary measures if he had not come to the office when told to do so, (2) the student was never told by either the officer or the principal that he was free to leave the office, and (3) the student was being interviewed as a suspect rather than a witness. As a result, the court concluded that the interrogation was custodial. *Killitz*, 651 P.2d at 1383–84.

In *Loredo*, a thirteen-year-old student was summoned to the principal's office where he was interviewed by a police officer in plain clothes. However, in contrast to the situation in *Killitz*, the officer immediately informed the student that he was not under arrest, that he could leave if he wanted to, and that he did not have to answer any of the officer's questions. *Loredo*, 865 P.2d at 1313–1314. The court concluded that the student was not in custody for purposes of *Miranda*—but the court made the following observation:

> [Because] the school setting is more constraining than other environments, it is especially important that police interviews with children, when carried out in that setting, are conducted with due appreciation of the age and [level of] sophistication of the particular child. An interview that would not be "compelling" for an adult might nonetheless frighten a child into believing that he or she was required to answer an officer's questions. Accordingly, special precautions should be taken to ensure that children understand that they are not required to stay or answer questions asked of them by a police officer.

*Id.* at 1315. *Accord, State v. Budke*, 372 N.W.2d 799, 801 (Minn.App.1985) (holding that an eighteen-year-old suspect who was summoned to a police interview in the principal's office was not in custody because he was informed by the interrogating officer that he was free to leave the principal's office at any time).

The Oregon decision in *Killitz* is representative of the approach followed by many courts when they assess whether an interview is custodial for *Miranda* purposes when a student is compelled by school authorities to leave their normal classroom setting to speak with the police in a private location.

See *In re Welfare of R.J.E.*, 642 N.W.2d 708, 709–710 (Minn.2002), where the court affirmed the suppression of a confession made by a high school student who was interrogated in the school office by a uniformed police officer acting as a school "liaison" officer. The officer did not give *Miranda* warnings to the student, did not inform the student that he could decline to answer questions, did not inform the student that he was free to leave if he wished, and did not inform the student that he could have a parent present during the interview.

See also *In re Welfare of G.S.P.*, 610 N.W.2d 651, 657–58 (Minn.App.2000), where the court suppressed the statements made by a twelve-year-old middle school student with no prior criminal justice experience who was summoned to the principal's office and subjected to interrogation by the principal and a police officer. The student was not told that he was free to leave; in fact, the student was told that he had to answer the questions. The court held that the student was in custody for *Miranda* purposes—and that the student's statements had to be suppressed because he did not receive *Miranda* warnings.

See also *State v. D.R.*, 84 Wash.App. 832, 930 P.2d 350, 353 (1997), where the court suppressed the statements made by a fourteen-year-old boy who was interrogated by a police officer in the presence of the assistant principal and a school social worker. The interview took place in the assistant principal's office. The boy was told that he did not have to answer questions, but he was not otherwise given *Miranda* warnings. The court declared that the pertinent inquiry was whether a fourteen-year-old in the student's position would have "reasonably supposed his freedom of action was curtailed". The court concluded that the student was in custody during his interview, based on the police officer's failure to inform him that he was free to leave, the student's youth, the fact that the principal's office was a coercive environment for a child his age, and the accusatory nature of the interrogation.

See also *State v. Doe*, 130 Idaho 811, 948 P.2d 166, 172–74 (Idaho App.1997). In *Doe*, a ten-year-old boy was directed to leave his fifth-grade classroom and report to the faculty room, where he had been disciplined previously. There, he was interrogated by a police officer assigned to the school. The boy was not informed, either by school officials or by the officer who interrogated him, that he did not have to answer the officer's questions or that he could terminate the questioning at any time. No parent, guardian, or other adult was present to protect the boy's interest. And although the boy was ultimately informed that he was free to go, this did not occur until after the boy confessed. The court concluded that, under these circumstances, the boy was in custody and was entitled to *Miranda* warnings:

> We think it unlikely that the environment of a principal's office or a faculty room is considered by most children to be a familiar or comfortable setting, for students normally report to these locations for disciplinary reasons, as Doe had in the past. It is also unlikely that any ten-year-old would feel free to simply leave the administrative area of the school after having been summoned there by school authorities for a police interview. We are persuaded that under these circumstances a child ten years of age would have reasonably believed that his appearance at the designated room and his submission to the questioning was compulsory and that he was subject to restraint which, from such a child's perspective, was the effective equivalent of arrest. We hold that Doe was in custody for the purpose of *Miranda* and

therefore could not properly be questioned without prior advisement of his rights.

*Id.* at 173–74.

*See also In re I.J.,* 906 A.2d 249, 263–64 (D.C.App.2006); *In re Welfare of T.J.C.,* 662 N.W.2d 175, 181 (Minn.App.2003), *reversed on other grounds,* 667 N.W.2d 108 (Minn. 2003); *In re D.A.R.,* 73 S.W.3d 505, 512 (Tex.App.2002); *In re L.M.,* 993 S.W.2d 276, 290–91 (Tex.App.1999).

*Compare In re C.S.C.,* 118 P.3d 970, 976 (Wyo.2005) (holding that a high school student was not in custody during an interview conducted in a large school conference room by four police officers and a school official; the court analyzed several factors, including the fact that the student was told that he did not have to talk to the officers, that he was free to leave, and that he was not under arrest); *Doe v. Bagan,* 41 F.3d 571, 575 n. 3 (10th Cir.1994) (holding that even though a nine-year-old suspect may not have felt free to leave, he was not in *Miranda* custody when he was interviewed by two social service workers in the school principal's office); *In re J.H.,* 928 A.2d 643, 649–651 (D.C.App. 2007) (holding that a student was not in custody, even though the student was never informed that he had the right not to answer questions or the right to leave; the court relied on the trial court's findings that the officer who conducted the interview was "quiet", "soft-spoken", and "avuncular"—engaging in "about as gentle an interview as one could imagine under those circumstances"); *Dillard v. State,* 272 Ga.App. 523, 612 S.E.2d 804, 807–08 (2005) (holding that a high school student was not in custody, even though the school principal summoned the student to an interview conducted by two police officers, and even though, at the end of this interview, the student agreed to accompany the officers to the police department for further questioning; the court noted that the school interview took only 15 minutes, that the officers' manner was "conversational", that the officers never threatened the student, that the student was "reasonably intelligent" and "did not appear to be frightened", and that the student never objected to the questioning or asked to terminate the interview.).

*See also People v. Pankhurst,* 365 Ill. App.3d 248, 302 Ill.Dec. 329, 848 N.E.2d 628 (2006), which discusses the related issue of whether a student is in "custody" for *Miranda* purposes if *school officials* question the student about illegal acts, even though this questioning might be prompted by a police investigation. The *Pankhurst* court held that such interrogations are not custodial if (1) the school officials are legitimately concerned about the student's potential misdeeds because of their role as school administrators, and (2) the school administrators are not acting merely as cat's paws for the police in situations where the police would themselves lack authority or justification for the investigation. *Accord, J.D. v. Commonwealth,* 42 Va.App. 329, 591 S.E.2d 721, 725 (2004); *Interest of J.C.,* 591 So.2d 315–16 (Fla.App.1991) (holding that a high school student was not in custody when interrogated by the school principal, even though a police officer was present; however, the court indicated that if the *officer* had asked the questions, *Miranda* warnings would have been required).

Given the case law in this area, it is clear that the circumstances leading to Kalmakoff's first interview with the troopers have not been sufficiently litigated, or clarified, to allow us to make an informed decision as to whether Kalmakoff was in custody (and thus entitled to *Miranda* warnings) at the beginning of that interview.

We acknowledge that Kalmakoff was relatively young at the time of the interview (he had only recently turned fifteen), and the transcript of the interview shows that the troopers never told Kalmakoff that he could decline to answer their questions, or that he was free to leave whenever he wished, or that he had the right to have his grandparents (*i.e.,* his adoptive parents) present during the interview.

On the other hand, certain other important circumstances surrounding this first interview remain vague. Etuckmelra's conversation with Kalmakoff at the school was apparently not recorded, and the superior court made no findings on two crucial issues: what Etuckmelra or the school principal may have said or implied to Kalmakoff regarding (1)

whether he was required to leave school and attend the interview at the city office building, and (2) whether he was obliged to answer the troopers' questions if he did not wish to. The only express finding that the superior court made on these issues was that Etuckmelra "checked in with the [school] principal" and that she told Kalmakoff "that the troopers needed some information from him."

For these reasons, if we believed that the resolution of Kalmakoff's appeal required us to reach a firm conclusion as to whether he was in custody at the beginning of this first interview, we would have to remand Kalmakoff's case to the superior court for additional findings on these issues. However, as we are about to explain, we conclude that the statements Kalmakoff made at the third and fourth interviews are admissible even if we assume that the entire first interview should be suppressed. We further conclude that, given the admissibility of the third and fourth interviews, even if it was error to introduce Kalmakoff's statements from the first interview at his trial, that error was harmless.

*Why we conclude that Kalmakoff's statements from the third and fourth interviews are admissible*

■ As explained above, Judge Torrisi suppressed all of Kalmakoff's statements from the second interview, and we will now assume that Kalmakoff's statements from the first interview should likewise have been suppressed. The next question is whether these *Miranda* violations require suppression of Kalmakoff's statements from the two ensuing interviews—the third interview (the one that took place at Kalmakoff's home in the mid-afternoon of February 13, 2002) and the fourth interview (the one that took place when Kalmakoff was taken from school and arrested on the morning of February 14, 2002).

The method for analyzing this question is set forth in *Halberg v. State*, 903 P.2d 1090, 1097–1100 (Alaska App.1995).

3. 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222

The defendant in *Halberg* was questioned by the state troopers regarding the death of her husband. Halberg was advised of her *Miranda* rights, and invoked her rights, but the trooper who was questioning Halberg continued to interview her in spite of her invocation of rights. Later, Halberg was questioned a second time by the troopers. At this second interview, she again received *Miranda* warnings, and this time she explicitly waived her rights. The question on appeal was whether the statements obtained from Halberg at the first interview tainted the statements obtained at the second interview. *Id.* at 1092–93.

It was clear that the content of the second interview was influenced by the statements Halberg made at the first interview. The troopers who conducted the second interview referred to Halberg's earlier statements or implicitly relied on knowledge obtained from those earlier statements. Indeed, the trial judge in *Halberg* expressly found that, "given the fact that the officers at various points refer[red] back to [Halberg's] prior answers or statements", it would be "impossible" to conclude "that the contents of [Halberg's] second and subsequent statements would [have been] the same without the first statement." *Id.* at 1093.

But even though the second interview could be viewed as the "fruit" of the first interview, in the sense that the troopers who conducted the second interview either "explicitly referred to statements Halberg made at the first interview or . . . relied on knowledge obtained from Halberg's answers at the first interview", we held that this fact, standing alone, was not determinative of whether the statements made at the second interview should be suppressed. *Id.* at 1097–98. We explained that, even under the law as it existed before *Oregon v. Elstad*,[3]

> it [would be] error to employ [a] "but for" test to analyze whether Halberg's subsequent statements were the fruit of her first interview. Long before *Elstad*, the Supreme Court explicitly rejected a causation or "but for" test as the method for judging whether a defendant's statement is the result of a prior occurrence. *Brown v.*

(1985).

*Illinois,* 422 U.S. [590,] 603, 95 S.Ct. [2254,] 2261[, 45 L.Ed.2d 416 (1975)]; *Hutto v. Ross,* 429 U.S. [28,] 30, 97 S.Ct. [202,] 203–04[, 50 L.Ed.2d 194 (1976) *(per curiam)*].

The question is not whether the content of the second and subsequent interviews would have been the same if the initial interview had not taken place. Instead, the question is whether Halberg's decision to submit to the second and subsequent interviews was "sufficiently an act of free will to purge the ... taint" of the *Miranda* violation at the first interview. *Brown v. Illinois,* 422 U.S. at 602, 95 S.Ct. at 2261. Under this test, we must concentrate on Halberg's consent to participate in the subsequent interviews and decide whether this consent was tainted by the statements she made during the first interview.

*Halberg,* 903 P.2d at 1097.

We then explained that, under pre-*Elstad* law, courts looked to several different factors when assessing whether there had been "a sufficient break in the stream of events" to insulate a defendant's subsequent interview from a preceding *Miranda* violation. Here is our listing of these factors:

the purpose and flagrancy of the initial illegal act, the amount of time between the illegal act and the defendant's subsequent statement, the defendant's physical and mental condition at the time of the subsequent statement, whether the defendant remained in custody or was at liberty during this interval, whether the defendant had the opportunity to contact legal counsel or friends during this interval, whether the subsequent interview took place at a different location, whether the defendant's interrogators were the same officers who committed the prior illegal act, whether the evidence obtained from the prior illegal act affected the defendant's decision to submit to a subsequent interview, whether the police used lies or trickery to influence the defendant's decision, and whether there were other intervening events that affected the defendant's decision.

*Halberg,* 903 P.2d at 1098. We also explained that, under pre-*Elstad* law, the admissibility of a subsequent interview is deter-

mined by assessing all of these factors, with no single factor being dispositive. *Id.* (citing *Brown v. Illinois,* 422 U.S. at 603, 95 S.Ct. at 2261).

We now analyze Kalmakoff's case in light of these factors.

When assessing the purpose and flagrancy of the *Miranda* violations at the first two interviews, we must draw a distinction between the troopers' conduct at the first interview and the troopers' conduct at the second interview.

We have assumed that there was a *Miranda* violation at the first interview because Kalmakoff was taken from school by the village public safety officer, transported to the interview at the city office building, and never expressly advised that he could refuse to participate in the interview, or could refuse to answer particular questions, or could insist on the presence of a parent or guardian. But as Judge Torrisi noted in his written decision, the tone of this first interview was generally "polite" and "non-confrontational", and Kalmakoff "was not threatened, deprived, bullied[,] or lied to".

In this first interview, Kalmakoff admitted only two violations of the law: under-age drinking, and temporarily stealing a pistol and blanks so that he and his friend Aaron could go back to Aaron's house and shoot the gun.

We acknowledge that, at one point during this first interview, the troopers suggested that Kalmakoff might have killed B.K., or might have at least threatened B.K. with the pistol, or (alternatively) that Kalmakoff might know who killed B.K. But Kalmakoff immediately denied any personal guilt and any knowledge of who was guilty—and the troopers did not make any further accusations.

■ With regard to the *second* interview, our analysis of this factor is significantly different. In the second interview, the troopers repeatedly disregarded Kalmakoff's requests to leave the interview—requests that began at the very beginning of the interview. Then, when the troopers finally told Kalmakoff directly that he was not free

to leave, and when the troopers finally advised Kalmakoff of his *Miranda* rights, they failed to honor his invocation of his right to silence. As soon as Kalmakoff was told that he did not have to speak to the troopers, he immediately indicated that he did not wish to speak to them. But instead of ending the interview, the troopers continued to question Kalmakoff. They implied that he *did* have to speak to them, and that his only choice was whether to be questioned alone or in the presence of his grandparents. The troopers also demanded to know why Kalmakoff was not willing to speak to them, and they tried to get him to agree to be interrogated on a question-by-question basis.

In short, the conduct of the two troopers during this second interview was an egregious violation of *Miranda*.

Nevertheless, the troopers obtained little information from this violation. In response to the troopers' unlawful cajoling, Kalmakoff made only one self-incriminating admission: that he had consumed about half a pint of whiskey on the evening of the homicide. Then, almost immediately afterward, Kalmakoff again told the troopers, "I don't really feel like answering questions." At this point, the troopers finally honored Kalmakoff's invocation of his right to silence, and they stopped interrogating him.

Turning to the next several factors we note that there was a significant amount of time—approximately three and a half hours—between the second interview and the third interview. During this interval, Kalmakoff remained at liberty; he apparently went back to school at the end of the second interview, and then he went home at the end of the school day. Because of this, Kalmakoff had the opportunity to speak to family and friends during the several hours preceding the third interview.

At the third interview, Kalmakoff's interrogators were the same two troopers—Stephenson and Allen—who repeatedly violated but then eventually honored Kalmakoff's *Miranda* rights at the second interview. However, this third interview took place at Kalmakoff's home rather than at the city office building (the site of the first two interviews). Kalmakoff was not in custody during this

third interview, and both of his grandparents (his adoptive parents) were present with him during this interview.

The troopers did not use lies, trickery, or other deception to induce Kalmakoff to agree to this third interview. Indeed, they did not even ask Kalmakoff to make any further statements regarding his role in, or knowledge of, the homicide. Instead, the troopers merely asked Kalmakoff if he was willing to repeat the same things that he had already told them in the preceding two interviews, so that his grandparents would be aware of these things.

Finally, on the question of whether Kalmakoff's decision to participate in the third interview was materially affected by the statements obtained from him during the first and second interviews, we conclude that the answer is "no".

As we have explained, Kalmakoff made only two significant admissions during the first two interviews. He admitted that he had engaged in under-age drinking on the night in question, and he admitted that he and his friend Aaron had temporarily stolen a pistol and blanks from Rick Reynolds's house (and then had shot the pistol at Aaron Kalmakoff's house before returning it).

It is true that the troopers initiated the conversation at the third interview by asking Kalmakoff to tell his grandparents about the incident with the pistol. But if Kalmakoff had merely done what the troopers asked (that is, if Kalmakoff had simply *repeated* what he had already said about the pistol), this information would not have implicated him further in the homicide. Instead, as Kalmakoff began talking, he revealed more and more of his involvement in the homicide—far beyond anything that he had previously said. As the interview progressed, Kalmakoff admitted that he and B.K. got into an argument at Reynolds's house (because she was criticizing him for being drunk) and that, during this argument, Kalmakoff accidentally shot her. Kalmakoff then stated that, following this shooting, he carried B.K.'s body outside and placed it in some bushes.

The interview lasted less than 25 minutes and, as we noted previously, Kalmakoff never expressed a desire to stop the interview, nor any reluctance to continue answering questions.

When we evaluate the totality of these circumstances, we conclude that, even under pre-*Elstad* law, this third interview was sufficiently insulated from the *Miranda* violations that occurred at the first and second interviews. The statements that Kalmakoff made at this third interview were therefore properly introduced against him at his trial.

Our conclusion with respect to the third interview leads us to the same conclusion with respect to the fourth interview: Kalmakoff's statements during the fourth interview were likewise admissible.

■ Finally, given the relative unimportance of Kalmakoff's statements from the first and second interviews when compared to the expressly incriminating statements that Kalmakoff made during the third and fourth interviews, we conclude that even if it was error to admit statements from the first interview at Kalmakoff's trial, that error was harmless beyond a reasonable doubt.[4]

*Conclusion*

The judgement of the superior court is AFFIRMED.

BOLGER, Judge, not participating.

---

4. See *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), holding that constitutional error will require reversal of a criminal conviction unless the error is shown to be harmless beyond a reasonable doubt. And see *Motta v. State,* 911 P.2d 34, 39–40 (Alaska App. 1996) (citing *Arizona v. Fulminante,* 499 U.S. 279, 306–12, 111 S.Ct. 1246, 1262–66, 113 L.Ed.2d 302 (1991)), acknowledging that this test applies when the government introduces evidence of a confession obtained in violation of the defendant's *Miranda* rights.