Byron KALMAKOFF, Petitioner,

v.

STATE of Alaska, Respondent.

No. S–13439.

Supreme Court of Alaska.

July 29, 2011.

Josie Garton, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Petitioner.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions & Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Respondent.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

A jury convicted Byron Kalmakoff of raping and murdering his cousin in the village of Pilot Point. Kalmakoff had just turned 15 when the crime was committed. The Alaska

State Troopers sent to investigate the murder conducted four interviews with Kalmakoff while they were in Pilot Point. Before trial Kalmakoff moved to suppress his statements from those interviews based on violations of *Miranda v. Arizona*.[1] The trial court suppressed a portion of the first interview and all of the second interview but admitted all of the third and fourth interviews. The court of appeals affirmed Kalmakoff's convictions, concluding that any error in admitting portions of the first interview was harmless and that the third and fourth interviews were sufficiently insulated from any *Miranda* violations that occurred during the first two interviews. We granted Kalmakoff's petition for review and remanded the case to the trial court for additional factual findings, retaining jurisdiction. We now conclude that the *Miranda* violations in the first and second interviews violated Kalmakoff's right to remain silent and that the third and fourth interviews were tainted by the violations in the first and second interviews. We therefore reverse Kalmakoff's convictions and remand the case for a new trial.

## II. FACTS

On February 10, 2002, a 27-year-old woman, B.K., was reported missing in Pilot Point, a small village on the Alaska Peninsula with a population of less than 100. Molly Etuckmelra, the Village Public Safety Officer (VPSO), called Alaska State Trooper Shane Stephenson to report that B.K. was missing and called him again later to report that B.K.'s body had been found. B.K. had been shot twice in the head, and a later autopsy revealed injuries consistent with sexual penetration shortly before her death.

Trooper Stephenson and Trooper Pete Mlynarik flew from King Salmon to Pilot Point to begin the investigation.[2] Trooper Stephenson first visited the location where the victim's nude body had been discovered and attempted to secure the crime scene from the wind and snow. After learning that B.K. had attended a party at Rick Reynolds's house the previous night, Trooper Stephenson secured two additional crime scenes: Reynolds's house, where Stephenson believed B.K. had been shot, and an airport hangar where tire tracks, footprints, and blood had been found. Trooper Stephenson also began talking to the residents of Pilot Point "to get a general overview of the situation."

### A. The First Interview

On Tuesday, February 12, Troopers Stephenson and Mlynarik interviewed Byron Kalmakoff for the first time.[3] The troopers conducted interviews throughout the day in a meeting room at the Pilot Point city offices. The city offices were used for many purposes and contained the VPSO office. The room where the troopers conducted the interviews was approximately 20 feet by 30 feet, was well-lit with large windows, and had more than one door. The doors to the room were closed during the interviews, but no guards were stationed outside. The troopers were in uniform and visibly armed.

With the help of VPSO Etuckmelra, Trooper Stephenson put together a list of the people who had likely attended the party at Reynolds's house. Etuckmelra contacted the people on the list to let them know that the troopers wanted to speak with them. Three people on the list, including Byron Kalmakoff, were students who were in school. Kalmakoff had turned 15 only a few weeks be-

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (holding that statements obtained from defendants during custodial interrogation without warning of constitutional rights are inadmissible).

2. Trooper Stephenson arrived the evening of February 10 and Trooper Mlynarik arrived the morning of February 11.

3. Throughout Kalmakoff's pre-trial motions, trial, and appeal, the facts surrounding the first interview were somewhat vague. *See Kalmakoff v. State* (*Kalmakoff II*), 199 P.3d 1188, 1199–1200 (Alaska App.2009). After granting Kalmakoff's petition for review, we remanded the case to the trial court for additional factual findings pertaining to the first interview. *See infra* Part III.C. To avoid confusion, the facts recounted here reflect the trial court's additional findings on remand. One specific inconsistency in the record is whether Kalmakoff's first interview took place on Monday, February 11, or Tuesday, February 12. The trial court's findings on remand note that the date "actually appears to have been Tuesday, February 12."

fore. Etuckmelra drove to the school and informed the principal teacher, Jodi Mallonee, that she "needed to get Byron for the troopers so they could interview him." Mallonee had also received a phone call from the school superintendent's office in King Salmon authorizing her to release students for interviews with the troopers. Mallonee called Kalmakoff out of class and Etuckmelra drove him and two other students to the city offices in the VPSO truck. All that Etuckmelra told the students was that the troopers needed to get some information from them. The trial court found on remand that Kalmakoff "was not told that he did or did not have to accompany the VPSO to the city offices, and that it is likely that he believed that he had to go." Neither Mallonee nor Etuckmelra said anything to Kalmakoff about whether he had to answer the troopers' questions. Nobody contacted Kalmakoff's grandparents—who were also his adoptive parents—to inform them about the interview.

Troopers Stephenson and Mlynarik began interviewing Kalmakoff at 1:35 p.m. on Tuesday, February 12. The interview lasted just under an hour and a half, ending at 2:52 p.m. Trooper Stephenson described the interview as "informal and quiet." Trooper Mlynarik testified that he considered Kalmakoff a suspect because "[h]e was somebody that—that we had learned about due to some other situations," but Trooper Stephenson explained that he had not narrowed his list of suspects yet and at that point everyone who had attended Reynolds's party was a suspect.

The troopers did not tell Kalmakoff that he was free to leave or that he did not have to answer their questions; instead, they emphasized that Kalmakoff needed to tell them the truth. After taking Kalmakoff's basic background information, Trooper Stephenson told Kalmakoff: "I need for you to[,] um[,] be very specific and very ah[,] truthful with me[,] on everything that you answer so I don't have to come back[,] and ask you why okay[?] It'll look good . . . on your part." A few minutes later, Trooper Stephenson reminded Kalmakoff: "I want you to make sure that you're perfectly truthful with me . . . I will probably know if you're lying to me, okay[?]" The troopers did not administer *Miranda* warnings to Kalmakoff. Kalmakoff admitted to the troopers that he had been drinking on the night of the murder, that he had returned to Reynolds's house with his cousin (B.K.'s brother) to "check on" B.K. shortly before she was killed, and that B.K. was mad at them.

Once Kalmakoff made these admissions, the troopers' questions became more pointed and accusatory. After Kalmakoff admitted to being in Reynolds's house not long before the murder, Trooper Stephenson asked him: "I know that you were snooping, snooping around . . . which one of you picked up the gun?" Kalmakoff admitted that he had picked up a pistol and taken it outside. Trooper Stephenson began asking Kalmakoff about the details of the gun, reminding him: "I'm asking questions because I know[,] I know certain things, okay[?]" A few minutes later, after Kalmakoff described his conversation with B.K., Trooper Stephenson asked, "[A]nd[,] that's when things got out of control wasn't it[,] all messed up?" Kalmakoff denied this and repeated that he and his cousin had left Reynolds's house. Trooper Stephenson replied, "You're missing a chunk," and then asked a variety of questions implying that Kalmakoff was involved in the murder, including: "[Did] you guys cover her up?"; "How'd you get her downstairs?"; "Did you think you killed her[,] at that point?"; "Did you think that you did[,] because you thought they were blanks?" Kalmakoff responded, "I never killed her," and repeated that he and his cousin had taken the pistol and shot blanks outside his cousin's house.

Trooper Stephenson then took a break to have a drink of water and purchased a soda for Kalmakoff. During the break, Trooper Stephenson remarked to Trooper Mlynarik, "I think we're hot on the trail now . . . I haven't looked at the bottom of his shoes yet, but. . . ." [4] Kalmakoff's grandmother, Martha Kalmakoff, also arrived at the city offices during the break.[5] Trooper Stephenson saw

4. Blood-stained shoe prints had been found at the airplane hangar crime scene.

5. Martha learned about the interview when her daughter (Byron's aunt) called to tell her that she

Martha but did not ask her to join the interview, and Martha did not ask if she could join.

After the break, Kalmakoff asked how much longer the interview was going to continue. Trooper Stephenson answered "a little bit" but neither informed Kalmakoff that he was free to leave nor read him his *Miranda* rights. The troopers resumed questioning Kalmakoff about the gun, the ammunition, and the shell casings from the shots he fired with his cousin. The troopers then looked at the bottom of Kalmakoff's shoes and directed Kalmakoff to take off his jacket and shirt. Trooper Stephenson later testified that the sole of Kalmakoff's shoe resembled the prints that were found at the airplane hangar crime scene.

The troopers then took Kalmakoff outside so that he could show them the dumpster where he allegedly threw away the shell casings from the pistol. Kalmakoff also showed them his cousin's house where he and his cousin had shot the gun. Kalmakoff then asked if he had to go back to the city building where he had been questioned and Trooper Stephenson answered, "Yea[h], we're not even done." Trooper Stephenson later testified that at this point Kalmakoff was considered a prime suspect.

Upon returning to the city building, the troopers introduced themselves to Martha Kalmakoff. Trooper Stephenson informed Martha that he would be seizing Kalmakoff's four-wheeler, coat, shoes, and gloves, and asked her to get Kalmakoff some different clothes. Trooper Stephenson told Kalmakoff that he could go back to school but that he could not return to his grandmother's house or his biological mother's house until Trooper Stephenson gave him permission.[6] Trooper Stephenson later explained that he did not want Kalmakoff to return to those houses because he planned to obtain search warrants for them and because he was concerned that Kalmakoff might hurt himself if left alone at home.

### B. The Second Interview

The following day, February 13, Trooper Stephenson interviewed Kalmakoff again, this time accompanied by Trooper Craig Allen.[7] The setting of the interview was the same as the previous day and Kalmakoff was again transported to the interview from school. Trooper Allen began the interview by explaining that even though he and Trooper Stephenson had asked Kalmakoff to come speak with them, Kalmakoff was free to leave and could go back to school at any time. Almost immediately, Kalmakoff asked to go back to school:

KALMAKOFF: I go back right now if I want to?

ALLEN: Yeah, sure can. Okay? Is that what you want to do or do you want to talk with us a little bit so I can understand what's going on[?]

KALMAKOFF: I feel like going back.

ALLEN: Yeah. Okay. Is, is there any reason you don't want to talk to [us] about stuff that, that, that I'm going to ask you about?

KALMAKOFF: I can't barely remember anything.

ALLEN: Can't barely remember anything?

KALMAKOFF: Some times I black out.

ALLEN: Maybe, maybe if we talk a little bit maybe I could help you remember some stuff?

KALMAKOFF: I don't know, sorta scared.

ALLEN: Yeah, what are you scared about Byron?

KALMAKOFF: That I did it.

Trooper Allen continued to urge Kalmakoff to answer more questions, but Kalmakoff explained that it was hard because he felt ashamed. When Trooper Allen tried to ask

had heard that Byron had been taken to the city offices for questioning.

6. Although Kalmakoff lived with his grandparents, his biological mother still lived in Pilot Point and Kalmakoff told the troopers that he had slept at her house on the night of the murder.

7. Troopers Stephenson and Allen conducted the remaining interviews.

questions about what happened to B.K., Kalmakoff again asked to leave:

KALMAKOFF: Can I just go back to school?

ALLEN: You can go back to school any time you want. We've told you that. That's, that's entirely up to you.

KALMAKOFF: I just want to go back now.

ALLEN: Okay.

KALMAKOFF: I'm gonna go home and talk to my Grandma. (pause) I can go back now?

ALLEN: Beg pardon?

KALMAKOFF: Can we go back there?

ALLEN: You can go back there any time you want. It's up to you.

KALMAKOFF: Alright (inaudible).

STEPHENSON: Um, actually Brian, Byron, uh, um I'm going to have to ask you to stay here and, and talk with me.

It was only at this point that Trooper Stephenson first advised Kalmakoff of his *Miranda* rights and asked, "Do you understand each of these rights I have explained to you?" Kalmakoff nodded his head yes. Trooper Stephenson then asked, "Okay having these rights in mind do you wish to talk to me now?" Kalmakoff shook his head no. The troopers then advised Kalmakoff that he could have a parent or guardian present and tried to convince him to talk to them. They told him that he could decide to talk to them at any time, and that a lot of people decide to talk "because it's just such a heavy burden to carry . . . sometimes it's just best just to get it out." Trooper Stephenson told Kalmakoff: "Yesterday you and I had an agreement to be honest with each other. Um I, I want that agreement to stand today. I want you to be honest with me and we're going to be honest with you."

Kalmakoff again indicated that he wanted to remain silent and not answer any questions. Trooper Allen then told Kalmakoff that the troopers were going to describe their progress in the investigation and that Kalmakoff should let them know if something they said made him want to talk. Trooper Allen explained that they had been collecting physical evidence and that they wanted to understand what happened "[s]o that [when] people years from now look back at this, they don't think that the person who is responsible for this is a mean, evil, bad person." He asked Kalmakoff again: "Would you like to answer questions from me, even though you already told us before you didn't want to?" Kalmakoff again said no. But the troopers continued to question Kalmakoff, and Kalmakoff eventually admitted that he had drunk approximately half a bottle of whiskey on the night of the murder. A few minutes later, he repeated, "I don't really feel like answering questions."

Only then did the troopers finally honor Kalmakoff's invocation of his right to remain silent and stop interrogating him. But they did execute a search warrant of Kalmakoff's person that allowed them to photograph Kalmakoff naked, take hair samples from his head, arm, leg, and pubic area, and take swabs from his penis and the inside of his mouth. The interview ended at 12:10 p.m. and the troopers gave Kalmakoff a ride back to school.

### C. The Third Interview

Just over three hours after the end of the second interview, the troopers went to the house where Kalmakoff lived with his grandparents, Martha and Micarlo Kalmakoff, to serve the list of seized items from the night before. When the troopers arrived, Micarlo told them that he had spoken with his grandson but that Kalmakoff could not remember anything. Micarlo asked if the troopers could do something to help Kalmakoff remember, such as hypnotize him. Trooper Stephenson suggested that if the troopers talked to Kalmakoff they might be able to help him remember.

This third interview took place in the living room of Kalmakoff's grandparents' home and began at 3:35 p.m., about an hour after Kalmakoff returned home from school and about three hours after termination of the second interview. Trooper Stephenson asked Kalmakoff if he would talk to the troopers for a few minutes and suggested that Martha and Micarlo be present for the interview. When Kalmakoff did not respond, Trooper Allen

encouraged him to speak with them and include his grandparents to bring them "up to speed" on what he had already told the troopers:

> Because you know there's—there's some things that you might've told us already that they might not even know about. You think that'd be fair, you think? And we're not doing it to embarrass you or anything like that with your [g]randparents. Eventually all the information's gonna be available. Okay. [unknown indiscernible speaker] So ... would you like to start off so that you can bring your [g]randparents up to speed on everything that you've talked to us about already[?]

At that point, Trooper Stephenson added, "Byron, I just want to remind you that what I read to you earlier, still applies, but um, like—like I said, we're hoping we can just ah, get everything out in the open." The troopers did not administer new *Miranda* warnings. When Kalmakoff said that he didn't know where to start, Trooper Allen prompted him by referring to his earlier statement: "Well, let me, you know you—you could, did you talk with Trooper Stephenson about—about a gun?"

Kalmakoff then answered the troopers' questions and made several incriminating statements. Although he maintained that he had been too drunk to remember what happened, he admitted that he remembered moving B.K.'s body onto his four-wheeler; that he thought the gun went off in Rick Reynolds's house; and that he put B.K.'s body in the bushes. The interview ended at 4:00 p.m. and the troopers did not arrest Kalmakoff. The troopers flew back to King Salmon that night.

### D. The Fourth Interview

The next morning, February 14, Troopers Stephenson and Allen returned to Pilot Point with orders to make a video of what they had learned during their investigation. The troopers contacted Martha and Micarlo Kalmakoff to inform them that the troopers would be taking Kalmakoff to Anchorage. The troopers then went to get Kalmakoff from school. To avoid making a scene, the troopers asked a teacher to remove Kalmakoff from class.

Once they were outside, Kalmakoff repeatedly asked the troopers when he could return to school. The troopers first ignored these requests or provided misleading answers such as "we're going to sneak you out of class for a little while"; "what I wanted to do is have you spend a little bit of time with us today"; and "maybe an hour or so." Trooper Allen instructed Kalmakoff, "I wanna have you talk with us about what happened so that we can understand it very clearly[,] okay, so that nobody ... has any questions about stuff okay[,] would you like to go around with us and do that?" Kalmakoff responded, "I guess so," and then a few seconds later asked the troopers if they knew what would happen to him. No *Miranda* warnings were administered.

Trooper Allen then told Kalmakoff that the troopers would be taking him to Anchorage to appear in front of a judge. Kalmakoff responded, "I didn't do it on purpose," and asked if B.K.'s mother had been told of his involvement. Trooper Allen said no, and Kalmakoff requested, "If you guys do tell 'em, tell them I didn't mean to do it on purpose." Trooper Stephenson said that he understood and that bad things happened; Kalmakoff replied, "It's that dang booze."

At that point, after the troopers had convinced Kalmakoff to participate in the interview and Kalmakoff had made additional incriminating statements, Trooper Allen administered *Miranda* warnings to Kalmakoff. Trooper Allen prefaced those warnings by saying: "I want to go through this with you real quick okay cause we've done this before but this is, this is more official now cause I've told you I'm taking you with me, to McLaughlin," apparently referring to McLaughlin Youth Center, a juvenile detention center. Kalmakoff said that he had heard of McLaughlin. Trooper Allen continued: "So I, listen to what I read to you[,] and I'm gonna ask you these questions again, we did this before but I just want to do it again for you all right."

Trooper Allen read Kalmakoff his rights and Kalmakoff agreed that he understood those rights and that he would speak with

the troopers. The troopers then drove Kalmakoff to the various crime scenes so that Kalmakoff could show them what happened to the best of his recollection and they could videotape it. During the videotaped interview, Kalmakoff described shooting B.K., moving her body to the airplane hangar on his four-wheeler, removing B.K.'s clothes and having sex with her, and leaving B.K.'s body in the bushes. The interview lasted for a little over an hour.

## III. PROCEEDINGS

Kalmakoff was charged as a juvenile with first-degree murder, second-degree murder, manslaughter, kidnapping, first-degree sexual assault, second-degree sexual assault, first-degree burglary, second-degree theft, and tampering with physical evidence.[8] The State filed a petition in the superior court to waive juvenile jurisdiction so that Kalmakoff could be prosecuted as an adult.[9] The superior court conducted a waiver hearing and granted the petition.[10] Kalmakoff was then indicted for the same offenses. Following trial, a jury convicted Kalmakoff of second-degree murder, manslaughter, kidnapping, first-degree sexual assault, second-degree sexual assault, second-degree theft, and tampering with physical evidence. He was acquitted of first-degree murder and first-degree burglary. Kalmakoff was sentenced to a composite term of 75 years with 50 years suspended.

### A. The Suppression Motion

Prior to trial Kalmakoff filed a motion to suppress the statements he made to the Alaska State Troopers during the interviews in Pilot Point. The superior court held an evidentiary hearing and issued a written decision granting Kalmakoff's suppression motion in part and denying it in part.

The trial court ruled that Kalmakoff was not in custody during the first part of the first interview. The trial court decided, however, that the first interview became custodial during the break when Trooper Stephenson left to get a drink of water. The trial court considered Trooper Stephenson's comment that the troopers were "hot on the trail now," the troopers' refusal to answer Kalmakoff's subsequent questions about how long the interview would last, and the troopers' order directing Kalmakoff to remove his shirt. The trial court concluded that the second part of the first interview was custodial and that Kalmakoff's statements from that part of the interview should be suppressed because the troopers failed to administer *Miranda* warnings.

Regarding the second interview, the State conceded that Kalmakoff's statements made after *Miranda* warnings were administered should be suppressed because the troopers ignored Kalmakoff's invocation of his right to remain silent. The trial court went further and concluded that Kalmakoff's statements made prior to the *Miranda* warnings should also be suppressed because Kalmakoff was in custody throughout the interview. The trial court noted Kalmakoff's age, the fact that "[o]nce again, he had been taken from school and not afforded an opportunity to consult with a trusted adult," and that he "twice suggested that he would like to leave, and twice he was ignored."

The trial court also considered whether the violations during the first and second interviews tainted Kalmakoff's later statements made during the third and fourth interviews. The trial court concluded that because the third interview was not custodial and "[t]he prior illegality was not flagrant," "no admission from the first two [interviews] likely affected [Kalmakoff's] decision to talk" and the third interview was not tainted by the previous *Miranda* violations. Finally, with respect to the fourth interview, the trial court ruled that the troopers administered proper *Miranda* warnings and Kalmakoff gave a valid waiver of his rights. The trial

8. *State v. Kalmakoff (Kalmakoff I)*, 122 P.3d 224, 225 (Alaska App.2005).

9. *Id.*

10. *Id.* After his conviction but prior to sentencing, Kalmakoff filed a motion to return jurisdiction to the juvenile court, and the superior court granted the motion. But the State petitioned the court of appeals for review of the order granting juvenile jurisdiction. The court of appeals reversed and Kalmakoff was sentenced as an adult rather than a juvenile offender. *Id.* at 225–26.

court therefore did not suppress Kalmakoff's statements from the third and fourth interviews.

### B. The Court Of Appeals' Decision

Following his conviction and sentence, Kalmakoff appealed the superior court's partial denial of his suppression motion; the court of appeals affirmed Kalmakoff's convictions.[11] The court of appeals held that "the circumstances leading to Kalmakoff's first interview with the troopers have not been sufficiently litigated, or clarified, to allow us to make an informed decision as to whether Kalmakoff was in custody (and thus entitled to *Miranda* warnings) at the beginning of that interview." [12] But the court of appeals explained that because the third and fourth interviews were admissible, "even if it was error to introduce Kalmakoff's statements from the first interview at his trial, that error was harmless." [13]

In determining that the third and fourth interviews were admissible, the court of appeals considered whether these interviews were tainted by the earlier violations under the factors articulated in *Halberg v. State.*[14] The court first examined the purpose and flagrancy of the illegalities at the first two interviews and concluded that although the first interview was polite and free of threats, bullying, or deprivation, the "conduct of the two troopers during [the] second interview was an egregious violation of *Miranda.*" [15]

But the court of appeals decided that other *Halberg* factors outweighed the egregious nature of the violation that occurred during the second interview.[16] The court emphasized that three and a half hours elapsed between the second and third interviews.[17] The court of appeals noted that "[d]uring this interval, Kalmakoff remained at liberty" and explained that Kalmakoff returned to school and then went home, which gave him "the opportunity to speak to family and friends during the several hours preceding the third interview." [18] The court did consider that the same troopers conducted the second and third interviews, but observed that the third interview took place at Kalmakoff's home; that the troopers did not use lies, trickery, or other deception to induce Kalmakoff to submit to the third interview; and that the third interview lasted less than 25 minutes.[19]

Finally, the court of appeals concluded that Kalmakoff's decision to participate in the third interview was not materially affected by the statements the troopers illegally obtained from him during the first two interviews. The court explained that in its view, Kalmakoff made only "two significant admissions" in the earlier interviews—that he was drinking on the night in question and that he and his friend had stolen a gun and blanks

11. *Kalmakoff v. State* (*Kalmakoff II*), 199 P.3d 1188 (Alaska App.2009).

12. *Id.* at 1199. Prior to the additional factual findings on remand, it was unclear what the school principal or the VPSO might have said to Kalmakoff regarding whether he had to attend the interview or answer the troopers' questions. There was also conflicting testimony regarding whether Kalmakoff's grandparents had been notified prior to the interview. *Id.* at 1199–1200, 1190.

13. *Id.* at 1200.

14. *Id.; see Halberg v. State,* 903 P.2d 1090, 1098 (Alaska App.1995). *Halberg* instructs courts to consider:

> [T]he purpose and flagrancy of the initial illegal act, the amount of time between the illegal act and the defendant's subsequent statement, the defendant's physical and mental condition at the time of the subsequent statement, whether the defendant remained in custody or was at liberty during this interval, whether the defendant had the opportunity to contact legal counsel or friends during this interval, whether the subsequent interview took place at a different location, whether the defendant's interrogators were the same officers who committed the prior illegal act, whether the evidence obtained from the prior illegal act affected the defendant's decision to submit to a subsequent interview, whether the police used lies or trickery to influence the defendant's decision, and whether there were other intervening events that affected the defendant's decision.

903 P.2d at 1098 (citations omitted).

15. *Kalmakoff II,* 199 P.3d at 1201–02.

16. *Id.* at 1202–03.

17. *Id.* at 1202.

18. *Id.* at 1202.

19. *Id.* at 1202–03.

from Reynolds's house.[20] The court acknowledged that the troopers had initiated the third interview by asking Kalmakoff to tell his grandparents about the gun, but suggested that if Kalmakoff had merely repeated his previous admissions, he would not have further implicated himself.[21] Based on the totality of these circumstances, the court of appeals held that Kalmakoff's statements from the third interview were sufficiently insulated from any earlier constitutional violations and were thus admissible at trial. The court also held that this same reasoning applied to the fourth interview and therefore Kalmakoff's statements from that interview were also properly admitted.[22]

### C. Petition For Review And Findings On Remand

Kalmakoff petitioned this court for review of the court of appeals' decision and we granted the petition. After briefing and oral argument, we issued an order on June 1, 2010, retaining jurisdiction and remanding to the trial court for additional factual findings.[23] We noted that in determining whether Kalmakoff's statements from the third and fourth interviews were tainted by earlier violations, "the court of appeals correctly looked to the factors articulated in *Halberg v. State.*"[24] However, we expressed our disagreement with the court of appeals' determination that Kalmakoff made "only two significant admissions during the first two interviews" and that these admissions did not play a significant role in convincing Kalmakoff to participate in the third interview.[25] We explained:

> Our review of the transcripts indicates that during the first half of the first interview, Kalmakoff made three highly significant admissions that may have influenced his later decision to confess in the third interview: that he was drinking on the night of the murder; that he and his cousin found the murder weapon in the house where the victim was sleeping and took it with them; and that he and his cousin returned to "check on" the victim several times and the victim became angry with him.[26]

Thus, to conduct a proper taint analysis for the third and fourth interviews, it was necessary to know whether these admissions were obtained legally or were the result of an interview conducted in violation of *Miranda.*

Because the court of appeals had held that the facts surrounding Kalmakoff's first interview were not sufficiently clear to determine whether Kalmakoff was in custody throughout that interview, we remanded to the trial court for additional factual findings.[27] The trial court issued additional factual findings on August 31, 2010. We then ordered supplemental briefing addressing whether, in light of the additional findings on remand, Kalmakoff was in custody throughout the first interview and what effect Kalmakoff's statements in that interview might have on the taint analysis for the third and fourth interviews.

## IV. STANDARD OF REVIEW

"We accept the trial court's factual findings except when clearly erroneous."[28] We review questions of law de novo and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[29] Whether the facts found by the trial court "lead to the conclusion that the defendant [was] in custody for *Miranda* purposes" is a mixed question of law and fact, and we therefore "apply *de novo* review to the ultimate *Miranda* custody determination" on appeal.[30] Whether a defendant's subsequent statement is tainted by a prior illegality is a question of law, and we thus "independently determine[ ]

20. *Id.* at 1202.

21. *Id.*

22. *Id.*

23. Alaska Supreme Court Order No. 69 (June 1, 2010).

24. *Id.* 2.

25. *Id.* 4.

26. *Id.*

27. *Id.* ¶ 6–8.

28. *State v. Smith,* 38 P.3d 1149, 1153 (Alaska 2002).

29. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

30. *Smith,* 38 P.3d at 1153.

whether, under [the trial court's findings of historical fact], the defendant's decision to speak with the police was voluntary and sufficiently insulated from the prior illegality to escape its taint."[31]

## V. DISCUSSION

Kalmakoff argues that he was in police custody throughout his first interview with the Alaska State Troopers and was thus entitled to *Miranda* warnings; that the troopers violated *Miranda* and Kalmakoff's right to remain silent in the second interview; and that these violations tainted the statements obtained in the third and fourth interviews, ultimately requiring that the statements from all four interviews be suppressed.[32] We begin our analysis by reviewing the protections against self-incrimination guaranteed by the United States Constitution and the Alaska Constitution. We then turn to whether Kalmakoff was in custody throughout the first interview and whether Kalmakoff's statements made during the third and fourth interviews were tainted by prior illegalities and thus should have been suppressed.

### A. The Protections Guaranteed By The Fifth Amendment To The United States Constitution And Article I, Section 9 Of The Alaska Constitution

"A criminal suspect's right to remain silent in the face of police interrogation represents one of the most fundamental aspects of our constitutional jurisprudence."[33] The Fifth Amendment to the United States Constitution and article I, section 9 of the Alaska Constitution guarantee that no person "shall be compelled in any criminal [case or proceeding] to be a witness against himself."[34] "While the core protection is a prohibition on compelling a defendant to testify against himself at trial,"[35] the privilege against self-incrimination is also "enforceable in any setting where a suspect is subject to custodial police interrogation."[36]

In the landmark case of *Miranda v. Arizona*, the United States Supreme Court recognized that because custodial interrogation involves inherent pressures that can compel a suspect to speak against his will, "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice."[37] The Court therefore held that "[i]n order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."[38] The Court specified that prior to questioning, a suspect in police custody must be warned "that he has the right to remain silent, that

31. *Halberg v. State*, 903 P.2d 1090, 1095 (Alaska App.1995).

32. Kalmakoff also maintains that he was in police custody during the third interview at his grandparents' home and that this interview contained independent *Miranda* violations. We need not address this question because we conclude that even if Kalmakoff was not in custody during the third interview, that interview was tainted by the violations that occurred in the first and second interviews. *See infra* Part V.C.2.

33. *Beavers v. State*, 998 P.2d 1040, 1045 (Alaska 2000).

34. The due process clause of the Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination such that it is protected from abridgment by the States. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). To the extent that our interpretation of this privilege may be more protective than federal constitutional law, we base our ruling on article I, section 9 of the Alaska Constitution. *See Beavers*, 998 P.2d at 1046 n. 30. "While we have observed that the language of § 9 is 'virtually identical' to the wording of the Fifth Amendment of the United States Constitution, we have interpreted § 9 more broadly than the U.S. Supreme Court has construed the Fifth Amendment of the Federal Constitution." *Munson v. State*, 123 P.3d 1042, 1049 n. 48 (Alaska 2005) (internal citations omitted).

35. *Munson*, 123 P.3d at 1047 (citing *United States v. Patane*, 542 U.S. 630, 638, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004)).

36. *Id.* at 1047 (citing *Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Beavers*, 998 P.2d at 1045 & n. 25).

37. 384 U.S. at 458, 86 S.Ct. 1602.

38. *Id.* at 467, 86 S.Ct. 1602.

anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."[39]

The *Miranda* warnings are "concrete constitutional guidelines" that act as critical procedural safeguards of a suspect's privilege against self-incrimination.[40] The warnings are "absolute prerequisite[s] in overcoming the inherent pressures of the interrogation atmosphere."[41] For that reason, "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion," and any unwarned statements must be excluded from evidence.[42,43]

Not only must police apprise a suspect of his constitutional rights by administering the *Miranda* warnings, they must also fully honor the exercise of those rights:

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.[44]

Post-*Miranda* United States Supreme Court decisions have reiterated that a suspect's right to cut off questioning includes the right to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation," and that the police must "scrupulously honor[ ]" a suspect's invocation of his right to silence.[45]

### B. Kalmakoff Was In Custody For *Miranda* Purposes Throughout His First Interview With The Troopers.

For the *Miranda* safeguards to apply, a person must be subject to custodial police interrogation. The *Miranda* Court described custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[46] Accepting the findings of historical fact made by the trial court, we apply de novo review to the *Miranda* custody determination.[47]

39. *Id.* at 479, 86 S.Ct. 1602.

40. *Id.* at 442, 444, 86 S.Ct. 1602; *see also Dickerson v. United States,* 530 U.S. 428, 434–35, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (holding that *Miranda* is a constitutional rule).

41. *Miranda,* 384 U.S. at 468, 86 S.Ct. 1602.

42. *Oregon v. Elstad,* 470 U.S. 298, 307, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *see also New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) ("[S]tatements made under [custodial interrogation] are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights."); *Munson v. State,* 123 P.3d 1042, 1047 (Alaska 2005) ("The failure to provide proper warnings ... is generally sufficient to exclude any statements obtained.") (citing *Missouri v. Seibert,* 542 U.S. 600, 608, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004)).

43. For a suspect's statement to be admissible, that statement must also have been voluntarily made, *see Elstad,* 470 U.S. at 304, 105 S.Ct. 1285 (explaining that statements are involuntary under the Due Process Clause if they are obtained by techniques and methods offensive to due process); *Hunter v. State,* 590 P.2d 888, 899 (Alaska 1979) (describing an involuntary confession as one where "a defendant's will was overborne" by coercive tactics), and the suspect must have made a knowing and intelligent waiver of his *Miranda* rights, *see Munson,* 123 P.3d at 1047 (citing *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984)). Voluntariness and waiver are not at issue in this appeal.

44. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602; *see also Beavers v. State,* 998 P.2d 1040, 1045–46 (Alaska 2000) ("A criminal suspect's right to remain silent ... includes the right to terminate an interrogation at any time." (internal citations omitted)).

45. *Munson,* 123 P.3d at 1048 (quoting *Michigan v. Mosley,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)).

46. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

47. *State v. Smith,* 38 P.3d 1149, 1153 (Alaska 2002).

Our test for determining whether a person is in custody for *Miranda* purposes is set out in two cases: *Hunter v. State*[48] and *State v. Smith*.[49] In *Hunter*, we adopted an objective "reasonable person" test,[50] holding that "custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived." [51] We further described this test as requiring "some actual indication of custody such that a reasonable person [in the suspect's position] would feel he was not free to leave and break off police questioning." [52] In *Smith*, we reaffirmed the *Hunter* test [53] but clarified that the "ultimate inquiry" is whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." [54]

Both *Hunter* and *Smith* describe three categories of facts that are relevant to the custody determination: (1) "facts pertaining to events before the interrogation," particularly whether the defendant came to the place of questioning "completely on his own, in response to a police request, or [was] escorted by police officers"; (2) "facts intrinsic to the interrogation," such as when and where it occurred, how long it lasted, how many officers were present, what the officers and defendant said and did, whether there were physical restraints, drawn weapons, or guards stationed at the door, and whether the defendant was being questioned as a suspect or witness; and (3) post-interrogation events, particularly whether the defendant "left freely, was detained, or was arrested." [55] We noted in *Smith*, however, that "[t]he post-interview events factor is of limited weight." [56]

As the court of appeals recognized, the *Miranda* custody determination in this case is complicated by Kalmakoff's age and the fact that he was removed from school for the police interview.[57] The court of appeals conducted a survey of relevant case law regarding "whether, and how, an adolescent's status as a secondary school student affects the assessment of whether a police interview is 'custodial' for purposes of *Miranda* when the adolescent is summoned from class to be interviewed." [58] The court of appeals concluded that other courts "are virtually unanimous in recognizing that a directive or 'request' for a secondary school student to leave class for the purpose of being questioned by a police officer can result in a custodial interrogation for *Miranda* purposes." [59] The court of appeals further explained that factors generally considered by other courts include: (1) "the age and sophistication of the student"; (2) "whether the student was told that [the student was] free to leave or to break off the questioning if [the student]

48. 590 P.2d 888 (Alaska 1979).

49. 38 P.3d 1149 (Alaska 2002).

50. *Hunter,* 590 P.2d at 895.

51. *Id.* at 894–95 (quoting *People v. Arnold,* 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515, 521 (1967) (in bank), *overruled on other grounds by Walker v. Super. Ct.,* 47 Cal.3d 112, 253 Cal.Rptr. 1, 763 P.2d 852 (1988) (in bank)).

52. *Id.* at 895.

53. *Smith,* 38 P.3d at 1154 (reiterating that we must decide "given the totality of [the] circumstances, whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave").

54. *Id.* (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)).

55. *Id.* at 1154; *Hunter,* 590 P.2d at 895.

56. *Smith,* 38 P.3d at 1159.

57. *Kalmakoff v. State (Kalmakoff II),* 199 P.3d 1188, 1197 (Alaska App.2009).

58. *Id.* at 1197–99 (citing *Doe v. Bagan,* 41 F.3d 571, 575 n. 3 (10th Cir.1994); *In re J.H.,* 928 A.2d 643, 649–51 (D.C.2007); *In re J.C.,* 591 So.2d 315, 316 (Fla.App.1991); *Dillard v. State,* 272 Ga.App. 523, 612 S.E.2d 804, 807–08 (2005); *State v. Doe,* 130 Idaho 811, 948 P.2d 166, 172–74 (App.1997); *People v. Pankhurst,* 365 Ill. App.3d 248, 302 Ill.Dec. 329, 848 N.E.2d 628, 632–36 (2006); *In re G.S.P.,* 610 N.W.2d 651, 657–59 (Minn.App.2000); *State v. Budke,* 372 N.W.2d 799, 801–02 (Minn.App.1985); *In re Loredo,* 125 Or.App. 390, 865 P.2d 1312 (1993); *In re Killitz,* 59 Or.App. 720, 651 P.2d 1382 (1982); *J.D. v. Commonwealth,* 42 Va.App. 329, 591 S.E.2d 721, 725 (2004); *State v. D.R.,* 84 Wash. App. 832, 930 P.2d 350, 352–53 (1997); *In re C.S.C. v. State,* 118 P.3d 970, 976–78 (Wyo. 2005)).

59. *Id.* at 1197.

wished"; and (3) "whether the student was given the opportunity to consult or obtain the presence of a parent or guardian." [60]

We agree with the court of appeals that these factors are relevant to the *Miranda* custody determination in this case and fit within the framework already established by *Hunter* and *Smith*. The factors listed in *Hunter* and *Smith* are not exhaustive, and when a student is summoned from class to speak with a police officer, additional relevant factors to consider include whether the student was given the opportunity to consult with or obtain the presence of a parent or guardian; the student's age and sophistication; and whether the student was told that he was free to leave or break off questioning.[61] Indeed, the United States Supreme Court recently held that "a child's age properly informs the *Miranda* custody analysis." [62]

The court of appeals decided that the circumstances leading to Kalmakoff's first interview had not been sufficiently litigated or clarified to determine whether Kalmakoff was in custody throughout that interview.[63] We therefore remanded to the trial court for additional factual findings.[64] After reviewing the trial court's findings on remand and the supplemental briefing submitted by the parties, we now conclude that Kalmakoff was in custody throughout his first interview with the Alaska State Troopers. Although Kalmakoff was not formally arrested, his freedom of movement was restrained in such a way that a reasonable person in Kalmakoff's position would not have felt free to leave the interview or break off questioning.

The findings on remand regarding the events leading up to the first interrogation compel this conclusion. *Hunter* and *Smith* instruct that whether the suspect came to the place of questioning "completely on his own, in response to a police request, or [was] escorted by police officers" is an especially important factor to consider.[65] Here, Kalmakoff was removed from school and transported to the interview by the VPSO in her official vehicle. The troopers had instructed the VPSO to bring Kalmakoff, along with two other students, to the city offices. Even if the use of the VPSO truck can be explained by convenience, Kalmakoff was still escorted to the interview by a law enforcement officer. Furthermore, the VPSO told Kalmakoff that the troopers needed to get some information from him, and neither the VPSO nor the principal teacher told Kalmakoff that he did not have to attend the interview or answer the troopers' questions. On remand, the superior court found that Kalmakoff likely believed that he had to go with the VPSO to the interview. Finally, the superior court found that neither the troopers nor school authorities informed Kalmakoff's grandparents about the interview and Kalmakoff was not given the opportunity to consult with or obtain the presence of a parent or guardian before the interview began. Even when Kalmakoff's grandmother came to the city offices, the troopers did not inform her that they were questioning Kalmakoff or invite her to join them in the interview.

The State tries to downplay the significance of these facts by arguing that because students are accustomed to having their actions directed by school authorities, being directed to attend a police interview "is no

60. *Id.*

61. *See Smith*, 38 P.3d at 1154–55; *Hunter*, 590 P.2d at 895. The consideration of these additional factors does not transform the custody inquiry into a subjective test; we do not expect the police to bear "the burden of anticipating the frailties or idiosyncrasies of every person whom they question." *Hunter*, 590 P.2d at 896. We simply note that readily ascertainable facts, such as the suspect's age, are relevant to whether "[a] reasonable person *in the defendant's position*" would feel free to leave or break off questioning. *Id.* at 898 (emphasis added).

62. *J.D.B. v. North Carolina*, — U.S. —, 131 S.Ct. 2394, 2399, 180 L.Ed.2d 310 (2011); *see also id.* at 2403 (explaining that "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go").

63. *Kalmakoff II*, 199 P.3d at 1199.

64. Alaska Supreme Court Order No. 69 (June 1, 2010).

65. *Smith*, 38 P.3d at 1154 (quoting *Hunter*, 590 P.2d at 895).

more restrictive or intrusive than what the student may experience on other days for other reasons" and is not "tantamount to a formal arrest." The State notes that Kalmakoff was originally called out of class by the school's principal teacher and claims that removing Kalmakoff from school for the interview was therefore not "an infringement on [his] freedom of movement" because "[p]rincipals and teachers routinely assert authority over students." The State compares being summoned for a police interview to being told to go to the counselor's office to discuss class choices or the auditorium to take a standardized test.

This argument misunderstands the significance of the school environment in a custody evaluation. It is precisely *because* students are accustomed to having their actions directed by school authorities that a student who is told by a principal or teacher that he must speak with a law enforcement officer might reasonably believe that he is not free to leave the interview or break off questioning.[66] Furthermore, a police interview is not something that a reasonable student would anticipate as part of a normal school day and is simply not comparable to routine activities such as taking a standardized test or speaking with a counselor about class choices. Thus, the fact that a student was directed by school authorities to leave class to speak with law enforcement officers is a relevant fact "pertaining to events before the interrogation" [67] that may, depending on the individual circumstances, support a finding of *Miranda* custody.

But even if we were to accept the State's premise, it would not change the outcome of this particular case. The State cites several cases where students who were summoned from class to meet with police officers were found not to be in *Miranda* custody. But all of these cases concern students who were questioned on school premises, whereas Kalmakoff, after being called out of class by the principal teacher, was removed from school by the VPSO and transported to the city building that contained the VPSO office.[68] And here it was the VPSO who told Kalmakoff that the troopers needed to get some information from him.

The events before the interrogation thus weigh strongly in favor of a finding that Kalmakoff was in *Miranda* custody throughout the first interview. Facts intrinsic to the interrogation also support this conclusion. Kalmakoff had turned 15 only a few weeks before, and he had no previous history of delinquent acts or contact with law enforcement. Troopers Mlynarik and Stephenson were in uniform and visibly armed, and they did not tell Kalmakoff that he was free to leave or that he did not have to answer their questions. Instead, Trooper Stephenson repeatedly emphasized that Kalmakoff needed to tell them the truth. Moreover, the troopers' questions became pointed and accusatory well before the break in the interview where the trial court found that the interview became custodial, including a series of questions that directly implicated Kalmakoff in the murder.

There are some facts intrinsic to the interview that, standing alone, suggest that the interview was not custodial: the troopers conducted interviews with several people throughout the day; the interview was conducted in a large, well-lit room with windows; no guards were stationed outside the room; no weapons were drawn; and the interview

66. *See In re Killitz,* 59 Or.App. 720, 651 P.2d 1382, 1384 (1982) ("[D]efendant cannot be said to have come voluntarily to the place of questioning. He would likely have been subject to the usual school disciplinary procedures had he not complied with the principal's request that he come to the office.").

67. *Smith,* 38 P.3d at 1154.

68. *See, e.g., In re J.H.,* 928 A.2d 643, 646–51 (D.C.2007) (holding that student was not in custody when summoned to speak with one plainclothes officer in large school conference room); *State v. Polanco,* 658 So.2d 1123, 1123–25 (Fla. App.1995) (holding that 18–year–old student was not in custody when summoned from class to speak with two plain-clothes detectives in school conference room, but remanding for a determination whether interview became custodial when student was asked to accompany the officers to the station for further questioning); *Dillard v. State,* 272 Ga.App. 523, 612 S.E.2d 804, 807–08 (2005) (holding that 18–year–old student was not in custody when summoned to speak with two investigators in the principal's office).

was described as "informal and quiet."[69] But in light of all the relevant facts, these circumstances do not change our conclusion that, from the beginning of the first interview, Kalmakoff's freedom was restrained in such a way that a reasonable person in Kalmakoff's position would not have felt free to leave or break off questioning. Kalmakoff was in custody for *Miranda* purposes throughout the first interview and was therefore entitled to *Miranda* warnings prior to questioning. Because the troopers failed to administer those warnings, all of Kalmakoff's statements made during the first interview were obtained illegally and must be suppressed.

### C. The Troopers' Actions In The First And Second Interviews Tainted Kalmakoff's Statements Made In The Third And Fourth Interviews.

"[A] criminal defendant can seek suppression of his or her statements to the police on the ground that those statements are tainted by a prior illegality."[70] For example, "a defendant may claim that his or her confession is the product of statements made at an earlier interview in which the police violated the defendant's privilege against self-incrimination."[71] Kalmakoff argues that the illegalities in the first and second interviews tainted the statements he made in the third and fourth interviews, ultimately requiring that all four interviews be suppressed.[72] Whether a defendant's subsequent statement is tainted by a prior constitutional violation is a question of law, and we therefore independently determine whether, under the superior court's findings of historical fact, "the defendant's decision to speak with the police was voluntary and sufficiently insulated from the prior illegality to escape its taint."[73] Because the law regarding whether a subsequent admission is tainted by a previous illegality has evolved over time, we first address the test we apply to determine whether Kalmakoff's later statements were tainted.

#### 1. The court of appeals correctly looked to the factors articulated in *Halberg v. State* to determine whether Kalmakoff's third and fourth interviews were tainted by prior illegalities.

Alaska courts have historically used a single legal test to determine whether a previous violation of a criminal defendant's Fifth Amendment rights—either an involuntary statement or a statement taken in violation of *Miranda*—tainted the defendant's subsequent statement.[74] The court of appeals explained this test in its leading opinion on this subject, *Halberg v. State:*

> As a preliminary matter, the government had to show that the defendant's subsequent statement was voluntary and, if the defendant was in custody during the subsequent interrogation, that the defendant received proper *Miranda* warnings and waived his or her rights. Assuming these foundational matters were proved, courts then analyzed the totality of the circumstances to assess whether the defendant's

69. The events after the interrogation do not weigh strongly for or against a finding of custody: Kalmakoff was not arrested, but his freedom of movement continued to be restrained when the troopers instructed Kalmakoff's grandmother not to allow him to return home. As we recognized in *Smith,* "[t]he post-interview events factor is of limited weight," 38 P.3d at 1159, and in this case it is even less probative because the superior court has already determined that the second portion of the first interview was custodial and the State has not challenged that determination.

70. *Halberg v. State,* 903 P.2d 1090, 1093 (Alaska App.1995) (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

71. *Id.*

72. As noted previously, *see supra* Part III.A, the superior court suppressed the entirety of Kalmakoff's second interview prior to trial based on the troopers' failure to properly administer *Miranda* warnings at the beginning of the second interview and their refusal to honor Kalmakoff's invocation of his right to silence once the warnings were finally administered. The State conceded prior to trial that Kalmakoff's statements made after *Miranda* warnings were administered should be suppressed because the troopers ignored Kalmakoff's invocation of his right to remain silent, and the State does not challenge the suppression of the second interview on appeal.

73. *Halberg,* 903 P.2d at 1095 (citations omitted).

74. *See id.* at 1094.

decision to give a subsequent statement was "sufficiently an act of free will to purge the primary taint."[75]

The totality of the circumstances analysis has also been described as whether there was a "break in the stream of events ... sufficient to insulate the [subsequent] statement from the effect of all that went before" [76] and as whether the connection between the illegal conduct of the police and the challenged evidence has "become so attenuated as to dissipate the taint." [77]

The *Halberg* test is based on the United States Supreme Court's decision in *Brown v. Illinois.*[78] In *Brown,* the United States Supreme Court clarified that whether the taint had dissipated was not a "but for" inquiry, rejecting the argument that suppression was always required when a defendant's subsequent statement was the result of prior illegality and instead held that "[t]he question whether a [subsequent] confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive." [79] The Court further explained that "[t]he temporal proximity of the [initial illegality] and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant" circumstances to consider.[80] The Alaska Court of Appeals agreed with this approach in *Halberg:*

> The question is not whether the content of the second and subsequent interviews would have been the same if the initial interview had not taken place. Instead, the question is whether [a defendant's] decision to submit to the [subsequent interview] was "sufficiently an act of free will to purge the ... taint" of the *Miranda* violation at the first interview.[81]

To answer this question, the court of appeals in *Halberg* instructed courts to consider a number of relevant factors:

> [T]he purpose and flagrancy of the initial illegal act, the amount of time between the illegal act and the defendant's subsequent statement, the defendant's physical and mental condition at the time of the subsequent statement, whether the defendant remained in custody or was at liberty during this interval, whether the defendant had the opportunity to contact legal counsel or friends during this interval, whether the subsequent interview took place at a different location, whether the defendant's interrogators were the same officers who committed the prior illegal act, whether the evidence obtained from the prior illegal act affected the defendant's decision to submit to a subsequent interview, whether the police used lies or trickery to influence the defendant's decision, and whether there were other intervening events that affected the defendant's decision.[82]

As we noted in our June 2010 order, the court of appeals correctly looked to the factors articulated in *Halberg* to determine whether Kalmakoff's statements from the third and fourth interviews were tainted by the prior illegalities.[83] In its initial briefing to this court, the State urged us to apply the test outlined by the United States Supreme Court in *Oregon v. Elstad* [84] rather than the *Halberg* factors. The *Elstad* Court held that when the only prior illegality is "a simple failure to administer the [*Miranda*] warn-

75. *Id.* (quoting *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (citing *Wong Sun*, 371 U.S. at 486, 83 S.Ct. 407)).

76. *Id.* at 1094 (quoting *Clewis v. Texas*, 386 U.S. 707, 710, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967)).

77. *Wong Sun*, 371 U.S. at 487, 83 S.Ct. 407 (quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)).

78. 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

79. *Halberg*, 903 P.2d at 1094 (quoting *Brown*, 422 U.S. at 603, 95 S.Ct. 2254).

80. *Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254 (footnotes and internal citations omitted).

81. *Halberg*, 903 P.2d at 1097 (quoting *Brown*, 422 U.S. at 602, 95 S.Ct. 2254).

82. *Id.* at 1098 (citations omitted).

83. Alaska Supreme Court Order No. 69 (June 1, 2010).

84. 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

ings," [85] a "careful and thorough administration of the *Miranda* warnings" prior to the subsequent statement "serves to cure the condition that rendered the unwarned statement inadmissible." [86]

Neither our court nor the court of appeals has ever decided whether to adopt *Elstad* as a matter of state constitutional law.[87] But we do not need to decide that question in this case because the facts here fall well outside of *Elstad*'s purview. *Elstad* involved only a failure to administer *Miranda* warnings, and the *Elstad* Court made clear that its decision did not apply to at least two scenarios: first, cases where the "initial unwarned statement [was] obtained through overtly or inherently coercive methods which raise serious Fifth Amendment and due process concerns" and second, cases "concerning suspects whose invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation." [88]

This case falls squarely within the second exception. The troopers did commit two procedural violations of *Miranda* when they failed to administer the warnings to Kalmakoff prior to the first and second interviews. But they also flatly ignored Kalmakoff's repeated invocations of his right to remain silent after they finally administered *Miranda* warnings midway through the second interview. This violation rises above the prophylactic concerns of *Miranda* and intrudes upon the constitutional right to remain silent in the face of police interrogation, a right that we have recognized as "one of the most fundamental aspects of our constitutional jurisprudence." [89] When the police fail to properly administer *Miranda* warnings, we presume that a suspect's statements are compelled in order to safeguard the privilege against self-incrimination.[90] But when the police refuse to honor a suspect's invocation of his right to silence, "any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." [91] Because the troopers in this case not only failed to administer *Miranda* warnings but also violated Kalmakoff's constitutional right to silence, we look to the factors articulated in *Halberg v. State* to determine whether Kalmakoff's decision to speak with the troopers in the third and fourth interviews was sufficiently insulated from the prior illegalities to escape their taint.

**2. The third interview was tainted by the prior illegalities.**

We begin by using the *Halberg* factors to analyze Kalmakoff's third interview with the troopers. We agree with the court of appeals that some of the *Halberg* factors suggest that there was a break in the stream of events between the interviews: Kalmakoff was not in custody during the few hours that elapsed between the interviews and thus had the opportunity to speak with friends or family at home or at school; the third interview took place at Kalmakoff's home, rather than the city building; the third interview lasted less than 25 minutes; Kalmakoff's grandparents were present at the third interview; and the troopers did not use lies or trickery to convince Kalmakoff to submit to the inter-

85. *Id.* at 309, 105 S.Ct. 1285.

86. *Id.* at 310–11, 105 S.Ct. 1285.

87. *See Munson v. State,* 123 P.3d 1042, 1049 n. 48 (Alaska 2005) (noting that we have interpreted article I, section 9 of the Alaska Constitution "more broadly than the U.S. Supreme Court has construed the Fifth Amendment of the Federal Constitution"); *see also, e.g., Blue v. State,* 558 P.2d 636, 641–43 (Alaska 1977) (construing the pre-indictment right to counsel more broadly than the federal constitution); *Whitton v. State,* 479 P.2d 302, 309–10 (Alaska 1970) (construing double jeopardy more broadly); *Baker v. City of Fairbanks,* 471 P.2d 386, 401–02 (Alaska 1970) (construing the right to jury trial more broadly); *Roberts v. State,* 458 P.2d 340, 342–43 (Alaska 1969) (construing the pre-trial right to counsel more broadly).

88. *Elstad,* 470 U.S. at 312 n. 3, 105 S.Ct. 1285.

89. *Beavers v. State,* 998 P.2d 1040, 1045 (Alaska 2000).

90. *See Elstad,* 470 U.S. at 306–07, 105 S.Ct. 1285.

91. *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

view.[92]

But our analysis differs from that of the court of appeals with respect to three significant factors: the troopers flagrantly violated Kalmakoff's rights during the second interview; they obtained important incriminating information through those violations; and they proceeded to use that illegally obtained information to convince Kalmakoff to submit to the third interview. Given this sequence of events, it is impossible to say that the connection between the troopers' illegal conduct and Kalmakoff's third interview statements was "so attenuated as to dissipate the taint." [93]

The United States Supreme Court in *Brown v. Illinois* instructed that "the purpose and flagrancy of the official misconduct" is a particularly important factor in determining whether a subsequent statement is insulated from the prior illegality.[94] Although there is no indication that the subjective intent of the troopers was to violate Kalmakoff's rights, the misconduct that occurred in this case was flagrant. The court of appeals described the troopers' violations in the second interview as "egregious." [95] The court of appeals stated that the troopers "repeatedly disregarded Kalmakoff's requests to leave the interview"; "failed to honor [Kalmakoff's] invocation of his right to silence"; and "implied that [Kalmakoff] *did* have to speak to them." [96] Moreover, the troopers implied that Kalmakoff's "only choice was whether to be questioned alone or in the presence of his grandparents"; "demanded to know why Kalmakoff was not willing to speak to them"; and "tried to get [Kalmakoff] to agree to be interrogated on a question-by-question basis." [97]

But the court of appeals decided that it "must draw a distinction between the troopers' conduct at the first interview and the troopers' conduct at the second interview." [98] The court thus concluded that even assuming the troopers violated Kalmakoff's *Miranda* rights in the first interview,[99] that violation was not flagrant because the tone of the interview was polite and Kalmakoff was not lied to, threatened, or bullied.[100] Although it may be true that this violation standing alone is not flagrant, we cannot ignore the reality that by the time of the third interview, Kalmakoff had been subjected to a pattern of violations: the failure to administer *Miranda* warnings at the first interview; the failure to properly administer the warnings at the beginning of the second interview; the refusal to honor his requests to leave the second interview before the warnings were administered; and the failure to honor his invocation of his constitutional right to silence after the warnings were given. We have previously recognized that "ignoring or rebuffing a suspect's invocation of his or her constitutional rights will convince the suspect that such rights are illusory." [101] This consequence is undoubtedly greater when the suspect's rights are repeatedly and persistently violated. The pattern of violations in this case is thus greater than the sum of its parts, and accordingly increases the flagrancy of the official misconduct.

The court of appeals also underestimated the significance of the information obtained through the troopers' misconduct. The court of appeals concluded that in the first inter-

92. *See Kalmakoff v. State* (*Kalmakoff II*), 199 P.3d 1188, 1202–03 (Alaska App.2009).

93. *Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)).

94. 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (internal citations omitted).

95. *Kalmakoff II*, 199 P.3d at 1202.

96. *Id.* at 1201–02.

97. *Id.* at 1202.

98. *Id.* at 1201.

99. We reiterate our conclusion that Kalmakoff was in custody throughout the first interview and that the troopers thus violated *Miranda* by failing to administer the warnings. *See supra* Part V.B.

100. *Kalmakoff II*, 199 P.3d at 1201.

101. *Mallott v. State*, 608 P.2d 737, 742 (Alaska 1980) (citing *Michigan v. Mosley*, 423 U.S. 96, 110 n. 2, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (White, J., concurring); *Miranda v. Arizona*, 384 U.S. 436, 466, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

view, "Kalmakoff admitted only two violations of the law: under-age drinking, and temporarily stealing a pistol and blanks so that he and his friend ... could go back to [the friend's] house and shoot the gun." [102] As we explained in our June 2010 order, we do not agree with this assessment:

> Our review of the transcripts indicates that during the first half of the first interview, Kalmakoff made three highly significant admissions that may have influenced his later decision to confess in the third interview: that he was drinking on the night of the murder; that he and his cousin found the murder weapon in the house where the victim was sleeping and took it with them; and that he and his cousin returned to "check on" the victim several times and the victim became angry with him.[103]

Given Trooper Stephenson's remark to Trooper Mlynarik that they were "hot on the trail now" after Kalmakoff gave these statements, it seems that the troopers also thought these admissions were significant.

Similarly, the court of appeals concluded that the troopers "obtained little information" from the violations that occurred in the second interview, stating that "Kalmakoff made only one self-incriminating admission: that he had consumed about half a pint of whiskey on the evening of the homicide." [104] But this ignores a crucial passage from the second interview. After Kalmakoff asked to leave the interview and return to school, the troopers pressed him on why he did not want to talk to them. In response, Kalmakoff said, "I don't know, sorta scared." When Trooper Allen asked what he was scared about, Kalmakoff replied, "That I did it."

Finally, we disagree with the court of appeals' conclusion that Kalmakoff's decision to participate in the third interview was not materially affected by the statements obtained from him during the first and second interviews.[105] When the troopers first asked Kalmakoff if he would speak with them in the presence of his grandparents, Kalmakoff did not respond. Trooper Allen then encouraged Kalmakoff to participate in the interview:

> Because you know there's—there's some things that you might've told us already that they might not even know about. You think that'd be fair, you think? ... Eventually all the information's gonna be available .... [unknown indiscernible speaker] [W]ould you like to start off so that you can *bring your [g]randparents up to speed on everything that you've talked to us about already* [?]

(Emphasis added.) When Kalmakoff said that he didn't know where to start, Trooper Allen prompted him by referring to a specific admission from the first interview: "[D]id you talk with Trooper Stephenson about—about a gun?"

Two things about this exchange demonstrate that Kalmakoff's decision to submit to the third interview was substantially affected by his earlier statements.[106] First, by telling Kalmakoff that it was only fair to tell his grandparents what he had told the troopers because "[e]ventually all the information's gonna be available," Trooper Allen communicated to Kalmakoff that refusing to participate in the interview would be futile given his

102. *Kalmakoff II,* 199 P.3d at 1201.

103. Alaska Supreme Court Order No. 694 (June 1, 2010).

104. *Kalmakoff II,* 199 P.3d at 1202.

105. *Id.*

106. Midway through this exchange is also when Trooper Stephenson made an oblique reference to Kalmakoff's *Miranda* rights, saying "Byron, I just want to remind you that what I read to you earlier, still applies, but um, like—like I said, we're hoping we can just ah, get everything out in the open." Because we do not reach the question whether Kalmakoff was in custody during the third interview, we cannot say that a full set of *Miranda* warnings was independently required. As the United States Supreme Court recognized in *Brown v. Illinois,* however, "[t]he *Miranda* warnings are an important factor ... in determining whether the confession is obtained by exploitation [of a previous illegality]," 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and a full and unqualified set of warnings at this juncture may have helped to dissipate the taint. But Trooper Stephenson's reference was by no means a full and unqualified set of warnings, and may only have served to remind Kalmakoff that his earlier attempt to exercise his rights was ineffective.

earlier incriminating statements.[107] Second, the message that it was futile to resist was compounded by Trooper Allen's direct references to the illegally obtained statements—both generally, by asking Kalmakoff to bring his grandparents "up to speed" regarding the earlier statements, and specifically, by prompting Kalmakoff to talk about the gun. Later in the interview, the troopers asked more specific questions about Kalmakoff's earlier admissions, including about "checking on" the victim and the victim's angry response toward Kalmakoff. By using these statements to induce Kalmakoff to participate in the third interview, the troopers connected that interview back to the flagrant violations of Kalmakoff's rights that they had committed only a few hours earlier. We therefore conclude that Kalmakoff's statements in the third interview were not sufficiently insulated from the taint of the prior illegalities, and those statements must be suppressed.

### 3. The fourth interview was tainted by prior illegalities.

Many of the same considerations lead us to conclude that Kalmakoff's statements made during the fourth interview were also tainted by prior illegalities. The same troopers conducted the fourth interview, and our analysis of the flagrancy of the prior illegalities and the information obtained from the earlier illegalities remains the same. We recognize that several of the *Halberg* factors weigh in favor of admitting the fourth interview: there was a break of almost 24 hours between the third and fourth interviews; Kalmakoff was at liberty during this interval; and the fourth interview took place at a different location. But given the exchange between the troopers and Kalmakoff at the beginning of the fourth interview, we cannot say that these factors created a "break in the stream of events ... sufficient to insulate the [fourth] statement from the effect of all that went before." [108]

The State argues that the fourth interview was sufficiently attenuated from the prior illegalities because "the troopers were not in any way overbearing, and at the beginning of the interview advised Kalmakoff of his *Miranda* rights and made it clear that the choice to participate in the interview was Kalmakoff's." But this characterization of the beginning of the fourth interview is not completely accurate. As described previously,[109] the troopers again went to Kalmakoff's school to remove him from class. Kalmakoff repeatedly asked the troopers when he could return to class, and they initially provided misleading answers, telling Kalmakoff that he could go back to school in a few hours.[110] Trooper Allen then told Kalmakoff, "I wanna have you talk with us about what happened so that we can understand it very clearly ... okay, so that nobody ... has any questions about stuff okay[,] would you like to go around with us and do that?" Kalmakoff responded, "I guess so." Thus, prior to administering *Miranda* warnings, and after misleading Kalmakoff about when he could return to school, the troopers had Kalmakoff agree to repeat the information that he had already provided to them. This exchange alone demonstrates that Kalmakoff's earlier incriminating statements materially affected his decision to participate in the final interview.

Kalmakoff asked the troopers what was going to happen to him, and Trooper Allen eventually told Kalmakoff that the troopers would be taking him back to Anchorage to appear in front of a judge. Kalmakoff then made several additional incriminating statements, telling the troopers repeatedly that he "didn't do it on purpose." The troopers reassured Kalmakoff that they understood and

**107.** *See Halberg v. State,* 903 P.2d 1090, 1099 (Alaska App.1995) (concluding that reminding Halberg of statements made in the previous interview was not problematic because "[t]he troopers never employed Halberg's prior statements to try to induce her to waive her rights (by suggesting that she might as well talk to the officers since she had already confessed)").

**108.** *Halberg,* 903 P.2d at 1094 (quoting *Clewis v. Texas,* 386 U.S. 707, 710, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967)).

**109.** *See supra* Part II.D.

**110.** At this point, the troopers had already told Kalmakoff's grandparents that they would be taking Kalmakoff back to Anchorage.

that they hadn't told the victim's family about Kalmakoff's involvement. It was only at that point—after Kalmakoff had agreed to participate in the interview and made more incriminating statements—that Trooper Allen administered *Miranda* warnings to Kalmakoff. Trooper Allen qualified the warnings by telling Kalmakoff, "I want to go through this with you real quick" and reminding him that "we did this before."

To fulfill their role as a critical constitutional safeguard, the *Miranda* warnings must "effectively advise the suspect that he [has] a real choice about giving an admissible statement at that juncture" and they must "reasonably convey that [the suspect can] choose to stop talking even if he had talked earlier." [111] Even if the troopers had advised Kalmakoff of his *Miranda* rights at the outset of the fourth interview, the pattern and flagrancy of the previous violations would have raised the question whether those warnings were effective. But the troopers did not administer the warnings until Kalmakoff agreed to go over the information he had already provided and had made further incriminating statements. Trooper Allen's language also implied that the warnings were merely a formality. The administration of the warnings here thus could not have provided Kalmakoff with a meaningful choice and was not sufficient to insulate the fourth interview from the prior violations of *Miranda* and Kalmakoff's constitutional right to remain silent. We therefore conclude that Kalmakoff's decision to submit to the fourth interview was not sufficiently an act of free will to purge the taint of the earlier violations, and Kalmakoff's statements must be suppressed.

## VI. CONCLUSION

To reduce the risk of coerced confessions and to implement the protections of the self-incrimination clauses of the Fifth Amendment to the United States Constitution and article I, section 9 of the Alaska Constitution, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." [112] In this case, Kalmakoff was not adequately and effectively apprised of his rights until midway through the second interview, and when he did eventually receive the *Miranda* warnings, his exercise of his right to remain silent was ignored. These violations tainted the statements that Kalmakoff made in the third and fourth interviews. It was thus error for the trial court to admit the first half of Kalmakoff's first interview and the entirety of the third and fourth interviews. This error was not harmless beyond a reasonable doubt and requires reversal of the convictions.[113] We REVERSE the decision of the court of appeals, REVERSE Kalmakoff's convictions, and REMAND this case for a new trial.

111. *Crawford v. State,* 100 P.3d 440, 448 (Alaska App.2004) (quoting *Missouri v. Seibert,* 542 U.S. 600, 612, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004)).

112. *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Seibert,* 542 U.S. at 608, 124 S.Ct. 2601.

113. *See Motta v. State,* 911 P.2d 34, 39–40 (Alaska App.1996) (explaining that constitutional error requires reversal of a criminal conviction unless that error is harmless beyond a reasonable doubt) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). The audio and video tapes of Kalmakoff's fourth interview were played for the jury and the prosecutor relied on all of the admitted statements in his opening statement and closing arguments. Here, admission and reliance on the statements that should have been suppressed to obtain the convictions requires reversal and a remand for new trial. *See, e.g., Klemz v. State,* 171 P.3d 1169, 1176 (Alaska App.2007); *Crawford v. State,* 100 P.3d 440, 451 (Alaska App.2004); *Miller v. State,* 18 P.3d 696, 701 (Alaska App.2001).